# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

DEBORAH BRADLEY, individually
and on behalf of others similarly
situated,

     Plaintiff,

v.                      CASE NO.: 1:20-cv-01094-CCB

DENTALPLANS.COM, and CIGNA HEALTH
AND LIFE INSURANCE COMPANY,
     Defendants.

DEPOSITION OF DEBORAH BRADLEY
WEDNESDAY, FEBRUARY 8TH, 2023
Regus Business Center, 200 E Pratt Street, Baltimore,
Maryland 21202

Reported by:  Jeaninn Alexis, Stenographic Reporter

Case 1:20-cv-01094-BAH    Document 111-2    Filed 10/06/23    Page 3 of 23
DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.
Deborah Bradley on 02/08/2023

Pages 2..5

**Page 2**

APPEARANCES

AMANDA J. ALLEN, ESQUIRE
        THE CONSUMER PROTECTION FIRM
        210 South MacDill Avenue
        Suite A
        Tampa, Florida 33609
        813.500.1500
        amanda@theconsumerprotectionfirm.com
        On Behalf of the Plaintiff

DERIN B. DICKERSON, ESQUIRE
        ALSTON & BIRD LLP
        1201 West Peachtree Street
        Atlanta, Georgia 30309
        404.881.7000
        derin.dickerson@alston.com
        On Behalf of the Defendant

**Page 3**

                I N D E X

        DEPOSITION OF DEBORAH BRADLEY
        WEDNESDAY, FEBRUARY 8TH, 2023

EXAMINATION BY:                                   PAGE
MR. DICKERSON                                        4
MS. KINGSBERY                                       76

EXHIBITS:   DESCRIPTION:                           PAGE
Exhibit 1   Notice of Deposition                    35
Exhibit 2   Amended Class Action Complaint          37
Exhibit 3   Plaintiff's Responses to Defendants' First   39
            Set of Interrogatories

Exhibit 4   Packet Call Records                     60

(Note:  Exhibits attached hereto.)

**Page 4**

            P-R-O-C-E-E-D-I-N-G-S

                        (10:12 a.m.)

Whereupon,

            DEBORAH BRADLEY,

the deponent herein, called for oral examination in the matter pending, being first duly sworn to tell the truth, the whole truth, and nothing but the truth,

        testifies as follows:

            EXAMINATION

        BY MR. DICKERSON:

    Q    Good morning.  My name is Derin Dickerson and I am counsel for DentalPlans.com as well as Cigna in this matter.

        You met Alexis.  She's our court reporter.

        Can you state your name for the record.

    A    Deborah Bradley.

    Q    And your address?

    A    314 Heather Way, Havre de Grace, Maryland 21078.

    Q    Have you your deposition taken before?

    A    Some years ago.

**Page 5**

    Q    I will ask you a little more about that, but just to lay down a few ground rules, I'll be asking a series of questions.  It's important that you hear and understand my question, so if you don't understand the question, feel free to ask me to rephrase it or restate it.

        Is that okay?

    A    That's okay.

    Q    The court reporter Alexis is here to take down everything you say and I say, and Amanda and her any objection, she will take those done as well.  So it's difficult for her to understand head nods and head shakes and uh-huh and uh-uh, even though that's how we talk in every day conversation -- so if you can say yes or no when appropriate, that would be helpful for Alexis.

    A    Okay.

    Q    From time to time, Amanda may object and that's okay.  You can still answer the question unless she instructs you not to answer.

        Okay?

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                    Pages 6..9

Page 6

A   Okay.

Q   And if you need a break at any time, let me know.  The only thing I ask is that you not take a break while a question is pending?

A   Okay.

Q   You mentioned that you have had your deposition taken before.  Can you tell me about that?

A   That was an accident case back in 1994 maybe.

Q   Were you involved in the accident?

A   Yes.

Q   Were you at fault or did you get hit?

A   I got hit.

Q   Was it a drunk driver or running a red light or a speeding incident?

A   I would say he didn't see me.

Q   Were you in a car or were you a pedestrian?

A   Car.

Q   Did you get injured in that accident?

A   Yes.

Q   Was it a serious injury?

Page 7

A   Serious enough, yes.

Q   And did you end up suing the driver or the insurance company?

A   Yes.

Q   Do you remember the name -- that was a two-part question.  Did you sue the insurance company?

A   I believe so, yes.

Q   Do you recall the name of the insurance company?

A   No.

Q   Did you see -- you sued the driver as well?

A   I don't think so.  I'm not for certain.

Q   You said that was in the '90s?

A   Yes.

Q   Is that the only time?

A   Yes, that's the only time I can remember, yes.

Q   Have you ever testified at trial?

A   No.

Q   Have you ever testified in a hearing?

A   No.

Page 8

Q   What did you do to prepare for today's deposition?

A   Just review the audio tapes.

Q   What audio tapes did you review?

A   The one that I got from counsel.

Q   Can you tell -- can you tell me which tapes in particular?

A   My initial contact with signing up and the calls that I made.

Q   Initial contact with DentalPlans?

A   Yes.

Q   And calls you made to DentalPlans?

A   Yes.

Q   Are those the only audio tapes that you reviewed?

A   Yes.

Q   What else did you do to prepare for today's deposition?

A   Nothing else.  Talk to counsel.

Q   And when you say counsel, are you talking about Amanda?

Page 9

A   Yes.

Q   Anyone else?

A   Alex.

Q   Anyone other than Amanda and Alex?

A   No.

Q   Did you talk to anyone other than counsel about today's deposition?

A   No.

Q   Other than the audio tapes that you mentioned, did you review any documents in preparation for today's deposition?

A   The only documents were the interrogatory documents.  That was it.

Q   Were these the interrogatories that you answered in this case?

A   Yes.

Q   Did you take any notes in preparation for this deposition?

A   No.

Q   You mentioned the lawsuit that -- involving the car accident in the '90s.  Have you been a named

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                    Pages 10..13

Page 10

party in any other lawsuit?

A    No.

Q    Have you been a member of a class --

A    No.

Q    -- a class action?

A    No.

Q    Have you ever received payment in connection with a class action?

A    No.

Q    Have you ever visited class action website?

A    No.

Q    Have you received mailings regarding class action?

A    No.  Well, yes, from State Farm.

Q    Tell me about that.

A    They said someone else is class action and that my -- I guess the type of account that I had is part of it, but nothing else other than that.

Q    Was it a notice of a settlement in that State Farm action?

A    No.

Page 11

Q    Did you fill out a claim form in that case?

A    No.

Q    Did you receive compensation in that case?

A    No.

Q    Who is representing you in this lawsuit?

A    Amanda Allen and Alex Burke.

Q    Anyone else?

A    No.

Q    How did you first get in contact with Amanda and Alex?

A    I started off talking with the Better Business Bureau and I -- the Internet -- looking for somewhere to do a consumer complaint.

Q    So you reached out to the Better Business Bureau?

A    Yes.

Q    Did you talk to anyone there?

A    No.  It was just a recording.  But later, I just looked online and I found consumer protection.

Q    Did you leave a recording for the Better Business Bureau?

Page 12

A    No.

Q    You listened to that recording from them?

A    Yes.  Just basically it was hours of operation or something to that effect.  I can't say that I left anything as far as -- or talk with anyone.

Q    So after you listened to the Better Business Bureau recordings, then you searched online for consumer protection attorneys?

A    Yes.

Q    How did you --

A    Something for complaints, for business complaints, so I thought the Better Business Bureau would be the start for that.

Q    What prompted you to reach out to the Better Business Bureau?

A    Just thought they could help me with how to handle what my concerns were going forward.

Q    What were your concerns?

A    It was that I felt like it was a disservice for me to be getting the calls and wanted the calls to stop, and wanted to file a complaint because of the

Page 13

calls I was receiving.

Q    When you say a complaint, do you mean a lawsuit or other type of complaint?

A    A complaint about the business.

Q    But not a lawsuit in court?

A    No, I didn't think it would be a lawsuit at the time.

Q    So when you searched for consumer protection attorneys, did Amanda and Alex come up in your search results?

A    No.  She was the person that I probably spoke with first as far as answer and I told them what my problem was, yes.

Q    How did you some to speak with Amanda?

A    Just calling the number.

Q    Which number?  I'm not asking for the number but is this the number you found online?

A    Yes, a phone number I found and called.

Q    Did you talk to any other attorneys before filing this lawsuit?

A    No.

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                                    Pages 14..17

Page 14

Q   Why did you choose Amanda and Alex?

A   They were the representation for me for consumer protection.

Q   Did you talk to Alex before hiring Amanda?

A   I spoke with Amanda first.

Q   When did you first talk to Alex?

A   Shortly after I spoke to her.

Q   Was this before you decided to retain them?

A   Can you rephrase?

Q   At some point, you decided they were going to be your lawyers?

A   Correct.

Q   Did you talk to Alex before you decided Amanda would be your lawyer?

A   I think they were right together as far as when I talked to her and had conversations.  Later I talked with him right after that.

Q   And just for the record, Alex, we are referring to Alex Burke?

A   Correct.

Q   Why did you choose Amanda and Alex?

Page 15

A   They were the representation for me for consumer protection.

Q   Why did you choose them as opposed to other attorneys?

A   They were the ones I contacted first so I didn't search for anyone else.

Q   Did you know Amanda or Alex before you reached out to them in connection with this lawsuit?

A   No.

Q   When was the first time you met them in person?

A   Today.

Q   You've never met Alex in person?

A   Never.

Q   How many times have you spoken to them, to Amanda?

A   To Amanda, over the years, if I were to estimate, about three to four times maybe.

Q   How many times have you spoken to Alex?

A   Approximately the same, three to four times.

Q   Are those three or four separate times or

Page 16

did you talk to them together?

A   Maybe a couple of times together but, individually, I've spoken to them as well.

Q   Has Amanda ever represented you in any other litigation?

A   No.

Q   Has she ever represented you in any other capacity?

A   No.

Q   Has Alex ever represented you in any other litigation?

A   No.

Q   Has he ever represented you in any other capacity?

A   No.

Q   You mentioned when you first reached out to the Better Business Bureau, you were intending to file a complaint, not a lawsuit; right?

MS. KINGSBERY:  Object to the form.

BY MR. DICKERSON:

Q   You can answer.

Page 17

A   I was actually looking to complain about the phone calls, yes.

Q   Not in court?

MS. KINGSBERY:  Object to the form.

You can answer.

THE DEPONENT:  No.

BY MR. DICKERSON:

Q   Whose idea was it to file a lawsuit in court?

A   Was mine.  I got counsel to represent me.

Q   Did you discuss suing Dental Plans or Cigna with anyone else?

A   No.

Q   When you first filed this lawsuit, you filed it only against DentalPlans?

A   Yes.

Q   Why is that?

A   I wasn't aware that they were separate.  I thought it was one in the same.

Q   Because you never had any communications with Cigna; right?

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                    Pages 18..21

Page 18

MS. KINGSBERY:  Object to the form.

You can answer.

THE DEPONENT:  Other than calling them.

BY MR. DICKERSON:

Q  You called Cigna?

A  The DentalPlans is Cigna?

Q  Well, you sued two entities in this lawsuit; right?

A  Okay.  Yes.

Q  You realize that?

A  Yes.

Q  You sued DentalPlans; right?

A  Yes.

Q  And you sued Cigna; right?

A  Are they a subsidiary?  Are they affiliates?

Q  You are not certain?

A  That's how I would review them, yes.

Q  Have you had any art actions with Cigna?

MS. KINGSBERY:  Object to the form.

MR. DICKERSON:  What's wrong with the form of that question?

Page 19

MS. KINGSBERY:  It's ambiguous.

BY MR. DICKERSON:

Q  Have you communicated with Cigna?

MS. KINGSBERY:  Same objection.

You can answer.

THE DEPONENT:  I didn't have -- I didn't call a separate Cigna other than I have Cigna in another area outside of DentalPlans.

Q  What other area do you have Cigna?

A  Medicare.

Q  Cigna is the provider for your Medicare?

A  Yes.

Q  So you communicated with Cigna in connection with your Medicare plan?

A  Yes.

Q  But not in connection with --

A  They don't have dental.

Q  When you decided to file this lawsuit, what did you expect to get out of it?

A  Fairness for the fact of what I felt was harassment.

Page 20

Q  What do you mean by fairness?

A  A review of compensation for what I felt they put me through as a customer.

Q  What kind of compensation?

A  Just fairness, whatever the courts and the jury would decide.

Q  And what is it that they put you through as a customer?

A  Well, I couldn't use my phone.  It was repeatedly being used, contacted, filling up my voicemail, it was a nuisance actually.  Constant calling, the automated system leaving messages, telemarketing, repeated calls that I had to turn my -- I had to turn my phone off or the volume down so it didn't interrupt my day.

Q  When you say you couldn't use your phone, what do you mean by that?

A  It was constantly ringing.  And I would put it away and cut it off because of that where all the messages would go into the voicemail.

Q  And what do you mean by constant?

Page 21

A  I mean, when I say constant, it was like -- okay, I could be doing something and look at my phone and it's them calling.  So at this point, I'm muting the phone so I can continue on what I've got going on because when they were calling, it was -- it wasn't just every now and then.  It was more than once or twice or three times a day and it was voicemail with maybe someone trying to solicit another sale for an additional year.

Q  And you are saying you were receiving several of those calls a day?

A  Yes.

Q  Every single day?

A  They were calling me where I had written down the numbers for where the calls were coming from. So I could find out who was -- where these calls were actually -- and they were saying DentalPlans at some point.

Q  During what time period were you receiving these calls?  Give me dates.

MS. KINGSBERY:  Object to the form.

Page 22

You can answer.

THE DEPONENT:  A range, maybe starting in -- was it September, October, November, and maybe even in December.

BY THE DEPONENT:

Q  And this was in 2019?

A  A year.

Q  I'm not holding you to specific dates, but it's your testimony that around September, October through December of 2019, you were receiving multiple calls from DentalPlans every day?

A  Yes.  Pretty much, they were pretty frequent.

Q  When you say pretty much, do you mean -- when I say every day, that's 30 or 31 days a month?

A  Right.

Q  Are you saying that you were receiving calls approximately 30 to 31 days a month?

MS. KINGSBERY:  Object to the form.

You can answer.

THE DEPONENT:  If they skipped a couple of

Page 23

days here and there, maybe, but constantly calling, yes.

BY MR. DICKERSON:

Q  So maybe not 30 or 31 but more than 20?

MS. KINGSBERY:  Objection to form.  Asked and answered.

You can answer.

THE DEPONENT:  I would say they had at least called within a month at least ten to 15 times in that month.

BY MR. FREY:

Q  Ten or 15 days?

MS. KINGSBERY:  Object to the form.

THE DEPONENT:  Some days it was more than one call so.

BY MR. DICKERSON:

Q  I guess I'm asking, you said they called ten or 15 times in a month?

A  Approximate.

Q  Was that ten or 15 calls or called multiple times on ten to 15 days?

Page 24

A  Called multiple times.

Q  On ten or 15 days?

A  Yeah, quite frequent.

Q  Is DentalPlans the only company that was calling you?

A  Yes.

Q  Have you been promised anything for your participation in this lawsuit?

A  No.

Q  Can you walk us through your education history beginning with high school?  Where did you go to high school?

A  Northern High.

Q  And where is Northern High?

A  Baltimore.

Q  It's in the City of Baltimore?

A  Yes.

Q  I'm sorry but when did you graduate?

A  1980.

Q  Did you go to college after you graduated from high school?

Page 25

A  No.

Q  And you graduated?

A  Yes.

Q  Do you have any other education post high school?

A  The other education would be probably on-the-job training where they certify you as mortgage -- underwriting.

Q  Do you currently work now?

A  No.

Q  Did you begin working immediately after you graduated from Northern High?

A  No.

Q  What did you do after you graduated?

A  I raised my family.

Q  You are married?

A  Yes.

Q  What's your -- you are married to Mr. Bradley.

A  Yes.

Q  What's his full name?

Page 26

A   Dennis.

Q   Do you have any kids?

A   Yes.

Q   How many?

A   Two.

Q   What their names?

A   Shawntay, S-H-A-W-N-T-A-Y.

Q   Is her last Bradley?

A   Hynson, H-Y-N-S-O-N.

Q   How old is SHE?

A   Forty-two.

Q   So she was born in 1981?

A   '80.

Q   When did you and Mr. Bradley get married?

A   1980.

Q   What month?

A   December.

Q   So about months after you graduated from high school?

A   I was 19, yes.

Q   No judgment.

Page 27

A   A young bride.

Q   And what's your other child's name?

A   Dennis.

Q   Junior?

A   Yes.

Q   And how old is Dennis Junior?

A   He's 1900 so he is 32.

Q   What's your daughter's birthday?

A   October.

Q   How long did you stay at home before going to work?

A   I worked part time when he was about two.

Q   And where'd you work?

A   It was Epsteins at the time.

Q   What is Epsteins?

A   No longer around, but it was a clothing store, a department store.

Q   How long did you work there?

A   A few years, a couple years.

Q   What was your next job?

A   I had two jobs, part-time jobs, J. J.

Page 28

Newberry.

Q   J. J. Newberry, what is that?

A   Another department store.

Q   And what was the other one?  Other job?

A   The Epstein and J. J. Newberry, both of those I worked at the same time.

Q   Got it.  How long did you work at J. J. Newberry?

A   Approximately two years.

Q   So from '81 to '83?

A   I became full time in '84, '85 with -- and finance and banking.

Q   What was the name of the company?

A   Equitable Bank.

Q   Equitable?

A   Mm-hmm.

Q   And this is all in the Greater Baltimore area?

A   Yes.

Q   What did you do for Equitable?

A   I started as -- in the proof department.

Page 29

Q   What does that mean?

A   It's encoding, checking coding.

Q   So you received checks and input the information in the checks in the system?

A   Mm-hmm.

Q   How long did you work at Equitable Bank?

A   Let's -- I went from Equitable -- I stayed in the banking industry in various jobs through my career to 2016.

Q   Who else did you work for in the banking industry?

A   The bank merged with several people so it went from M&T Bank.  Prior to that, it was Allfirst Bank, First Horizon Home Loans, Capital One Home Loans.

Q   So you worked for all of those different entities but they were just mergers or acquisitions, mergers, not actually you applying to a new company?

A   The -- yes.  Even through mergers, most of them went through mergers and then probably when I left from that entity in 2000, I think I went to

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                    Pages 30..33

Page 30

Susquehanna, but that was also because of close out, so switched at that point to another -- dealing can mortgages.

Q   What were you doing with mortgages?

A   It was a disbursement -- loan disbursement where I spoke with the builders and new acquisitions and setting up budgets, funding buildings, reviewing property bill out.

Q   Did you retire in 2016?

A   Yes.

Q   Have you worked since then?

A   No.

Q   Have you ever been arrested?

A   No.

Q   Excuse me have you been convicted of a crime?

A   No.

Q   Have you ever filed for bankruptcy?

A   No.

Q   Do you own your home?

A   Yes.

Page 31

Q   How long have you owned it?

A   Twenty-eight, maybe 28 years.

Q   Do you have mortgage?

A   Yes.

Q   Is it paid off?

A   No.

Q   Have you always paid it on time?

A   Yes.

Q   Have you missed a payment?

A   No.

Q   Have you ever been late on a payment?

A   No.

Q   Do you have any other debt?

A   What would you classify as debt?

Q   Other loans.

A   A bank card maybe.

Q   You are not sure if you have a bank card?

A   I mean that, to me, it's not debt.  I do have it.

Q   Do you have any other loans?

A   No.

Page 32

Q   Have you had any other loans?

A   No.

Q   Do you have a car?

A   Yes.

Q   You've never had a car note?

A   Well, I haven't had one in a long time. Back in 2004, maybe I had a loan.

Q   And you have credit cards?

A   Yes.

Q   Do you use them?

A   Occasionally.

Q   What do you mean by occasionally?

A   Just to keep them open.

Q   Is it like once a year or once a month or more frequently?

A   I use them around Christmas and then I'll pay them off.

Q   Do you ever miss a payment?

A   No.

Q   Have you ever missed a payment?

A   No.

Page 33

Q   Have you been late on a payment?

A   No.

Q   We talked a little bit about this but tell me what you understand this case to be about?

A   Obtaining help to stop unwanted calls.

Q   What kind of help?

A   Someone to help me stop receiving these unwanted calls.

Q   Are you still receiving unwanted calls?

A   No, it stopped once I contacted Consumer Protection.

Q   So calls have stopped.

A   Mm-hmm.

Q   So you no longer need help to stop unwanted calls?

    MS. KINGSBERY:  Object to the form.

    BY MR. DICKERSON:

Q   You can answer.

A   I don't have any unwanted calls.

Q   You understand that you are a proposed class representative; right?

DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.
Deborah Bradley on 02/08/2023                    Pages 34..37

Page 34

A    Yes.

Q    Do you know what that means?

A    Yes.

Q    What does it mean?

A    On the behalf of others in the same, similar type situation that I was in.

Q    And what situation was that?

A    Receiving harassing phone calls, being -- the calls were a nuisance so.

Q    What do you mean a nuisance?

A    Constant.

Q    Were they a nuisance because they were constant or because they were unwanted?

MS. KINGSBERY:  Object to form.

BY MR. DICKERSON:

Q    You can answer.

A    Both.

Q    So if you wanted the calls, would they still be a nuisance?

A    I would have never wanted them.

Q    Why not?

Page 35

A    Because I would rather reach out to someone than have them repeatedly contact me.

Q    What has been your involvement in this case to date?

A    I'm sure how to answer the question.  What was my involvement?

Q    What have you done in connection to this lawsuit to date?

A    Nothing remember.

(Bradley Deposition Exhibit 1 marked for identification.)

BY MR. DICKERSON:

Q    I'm handing you what's been marked Exhibit 1.  Do you recognize this document?

So my question was do you recognize this document?

A    I did take the time to look through it, didn't I?  I just have to look, but, yes.

Q    What is it?

A    It's the actual class action complaint.

Q    Did you review it before it was filed?

Page 36

A    I've seen some of it, yes.

Q    Did you see all of it?

A    I don't think I recall this part in the back.

Q    And you're referring to the civil cover sheet?

A    Yeah, the civil cover sheet, I don't recall that.  But the question of the information that was in the class action, yes.

Q    Are the facts and allegations in the class action complaint accurate?

A    To the best of my knowledge, yes.

Q    Take a look at paragraph 2 on the first page.  It says, plaintiff has received nonconsensual, prerecorded message calls from the defendant.

What does this mean?

A    I didn't ask for calls to be recorded.  The recorded type of calls I was receiving where like voice messaging calls.  They just started.

Q    Is it your testimony that you did not consent to receive prerecorded calls from

Page 37

DentalPlans.com?

A    No.  Rephrase that.

Q    Is it your testimony that you did not consent to receive prerecorded calls from DentalPlans.com?

A    I did not, no.

(Bradley Deposition Exhibit 2 marked for identification.)

BY MR. DICKERSON:

Q    I'm handing you what's been marked as Exhibit 2.  Do you recognize this document?

A    No, I don't recall this document.

Q    You don't recall ever seeing this before?

A    No.

Q    Do you know whether this document was filed in this litigation?

A    I recall filing, yes, of the class action, but I hadn't seen the document.

Q    And you're talking about Exhibit 2.  Exhibit 1 is the original complaint; right?

A    Yes.

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                    Pages 38..41

Page 38

Q   That you saw before filing; right?

A   I saw that.

Q   And that was the document that started the lawsuit; right?

A   Correct.

Q   But you've never seen Exhibit 2; correct?

A   I don't recall the paperwork on this one.

Q   So you didn't review that before it was filed?

MS. KINGSBERY:  Object to the form. Misstating the plaintiff's testimony.

BY MR. DICKERSON:

Q   You can answer.

A   We've discussed this but I didn't have the document.

Q   You didn't review it before it was filed?

MS. KINGSBERY:  Asked and answered.

You can answer again.

BY MR. DICKERSON:

Q   You can answer.

A   I didn't review it?

Page 39

Q   Correct.  I'm asking did you review it before you -- before it was filed?

A   No, I didn't review this.

Q   Have you reviewed any other legal documents in this case?

A   No.

(Bradley Deposition Exhibit 3 marked for identification.)

BY MR. DICKERSON:

Q   I'm handing you what been marked as Exhibit 3.  Have you seen this document before?

A   Yes.

Q   When did you first see it?

A   I can't say for sure.  And then I didn't -- I remember filling out some the questions but I think -- I'm going to say 2020.  I don't know exactly when.

Q   Did you review it before it was served in this case?

MS. KINGSBERY:  What do you mean?

MR. DICKERSON:  Exhibit 3 just to make the

Page 40

record clear.

BY MR. DICKERSON:

Q   Did you review Exhibit 3 before it was served in this case?

A   When was it served?

Q   July of '21?

A   I reviewed this -- I requested to see this a few weeks ago -- a few days ago because the paper that I had, I lost at my home so I asked to review it.

Q   So when we happen talking about your depo prep, you were referring to Exhibit 3; correct?

A   They look pretty much -- close -- the one -- this is the interrogatory, yes, this one.

Q   And my question is did you review Exhibit 3 before you reviewed it a few weeks ago in connection with this deposition?

A   No.  I reviewed -- I just reviewed -- I had it previously when I filled in the answers, and then I asked to review it again.

Q   Did you draft the answers that are contained in Exhibit 3?

Page 41

A   I gave these answers.

Q   Take a look -- were you still answering the question.  I'm sorry.

A   I was -- I did give answers to the interrogatories.

Q   Can you turn to the third page in Exhibit 8 to Item Number 8 and read that interrogatory and answer.  And you can read it to yourself.

Have you had a chance to read it?

A   Yes, I have.

Q   It says, describe in detail all facts that support plaintiff's contention in paragraph 19 of the complaint the plaintiff has been damaged by DentalPlans.com prerecorded voice calls.

Did I read that accurately?

A   Yes.

Q   And your answer begins, due to DentalPlans numerous calls, they were taking up her time and interrupting her day, turning down the volume on the phone making my calls go to voicemail.

Is that accurate?

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                              Pages 42..45

Page 42

A    Yes.

Q    When you say numerous calls, how many calls were there in total?

A    It was more than once in a day.

Q    And I guess what I'm asking for is the total number of calls.

A    That I would have thought I've gotten?

Q    Yes.

A    I counted when I looked at my phone at one time about 50 calls or more.

Q    And is that in that September to December 20 time frame?

A    Yes.

Q    And are you suing about all of those more than 50 calls?

MS. KINGSBERY:  I'm sorry.  I couldn't understand you.

BY MR. DICKERSON:

Q    Are you suing about all of those more than 50 calls?

A    Yes.

Page 43

Q    What was the nature of those calls?

A    What I heard from my voicemail was sales, telemarketing, and a previously recorded message.

Q    A prerecorded message about what?

A    Offering discounts.

Q    Did you ever ask DentalPlans for discounts?

A    No, I hadn't asked to resubscribe to the plan.

Q    Did you ever ask them for discounts?

A    I believe we talk -- no, they gave me a discount off the bat.

Q    But you never asked for a discount?

A    No.

Q    Did you ever express any interest in renewing?

A    I just asked what it would cost if I were to renew.

Q    Did you ever answer any of the calls?

A    I did.

Q    How many calls did you answer?

A    Probably one.

Page 44

Q    And when was that call?

A    When was it?

Q    Yes.

A    I don't know.

Q    Tell me what happened on that call.

A    Once I heard the prerecording, I hung up.

Q    You didn't talk to anyone?

A    No.

Q    Did you ever answer a call from DentalPlans where you talked to someone live?

A    No, my phone was off.

Q    Continuing to read your response to Interrogatory 8, the second sentence says, this caused her to miss other calls that she would have otherwise answered.

Did I read that correctly?

A    Yes.

Q    What other calls did you miss?

A    For family calling.

Q    How did you know you missed those calls?

A    I could tell they called.

Page 45

Q    Did they leave voice messages?

A    Yes.

Q    Did you call them back?

A    Often, yes.

Q    Were those calls important?

A    Yes.

Q    How were they important?

A    Usually to tell me if I need to pick up my kid, grandkid, or things like that.

Q    Did you ever miss picking up your grandkids?

A    No.

Q    Is that the only reason those calls were important?

A    Yes.

Q    Continuing to read your response, the next sentence says, moreover, the calls violated plaintiff's statutory rights under the TCPA the calls improperly invaded her privacy, temporarily ceased and trespass upon the use of plaintiff's phone, and forced plaintiff to divert attention away from other activities to address them.

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                                    Pages 46..49

Page 46

Did I read that correctly?

A    Yes.

Q    How did the calls from DentalPlans invade your privacy?

MS. KINGSBERY:  To the extent your answer involves conversations with us, I would advise you not to answer.  However, any independent response you have, you may go ahead and proceed.

THE DEPONENT:  I would say it was consistent calling that I did not want.

BY MR. DICKERSON:

Q    All right.  So you're saying the calls are unwanted?

A    Yes.

Q    My question is different.  Your response was they invaded you privacy; right?

A    Yes.

Q    How did the calls some invade your privacy?

A    Just because that they were continuous and I also had to check and see because they would fill up my voicemail and I was not able to respond to others

Page 47

because I turned my phone off or the ringer down so it would go to my voicemail, so I felt as though that change the use of my phone because of all the calls I was receiving and I didn't want to receive those calls.

Q    I think my question is different.  I'm asking about your privacy invasion allegation.  How did the calls invade your privacy?

A    They impacted my life.

Q    They impacted your life in what way?

A    The constant calling, being annoying and unwanted.

Q    You also say they temporarily seized and trespassed upon usage of your phone.  What does that mean?

A    Not authorized.

Q    How did they -- how did the calls temporarily seize your phone?

A    Not able to get -- getting constant calling, turning down the volume not able to get other call in because I had to turn my volume down to keep from

Page 48

receiving these calls when they were numerous.  I mean, it got to it point I left my phone on silent.

Q    But your interrogatory response says the call seized your phone; right?

A    Leaving messages, yes.

Q    And so I'm trying to understand how the call seized your phone.  I understand that you turned your phone off or turned it down.  My question is how did the calls seize and trespass upon your phone?

MS. KINGSBERY:  Objection.  Asked and answered.

BY MR. DICKERSON:

Q    You can answer.

A    Numerous voicemails.

Q    So the voicemails are seizure of your phone.  Is that your testimony?

MS. KINGSBERY:  Objection.

You can answer.

BY MR. DICKERSON:

Q    You can answer.

A    I would say so.

Page 49

Q    Anything other than the voicemails as a seizure of your phone?

MS. KINGSBERY:  Objection.  Asked and answered.  You can answer again.

THE DEPONENT:  Repeated calls.

BY MR. DICKERSON:

Q    Anything other than voicemails and repeated calls that you consider a seizure and trespass of your phone?

MS. KINGSBERY:  Same objection.

You go repeat again.

MR. DICKERSON:  She's not repeating; she's giving me different answers.

MS. KINGSBERY:  No, she -- the record will speak for itself.

You can answer.

I will note my objection.

BY MR. DICKERSON:

Q    Anything other than voicemails and repeated calls that you consider a seizure and trespass of your phone?

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                    Pages 50..53

Page 50

MS. KINGSBERY:  Objection.

THE DEPONENT:  Prerecorded messages.  No person, just messages.

BY MR. DICKERSON:

Q    Is that different than voicemails?

A    Telemarketers trying to offer me sales.

Q    When you say prerecorded messages, do you mean something different than voicemails?

A    It was two types.

Q    Can you explain the difference for me?

A    Well, one of them is an automated -- sounds like an automated system.

Q    Is that the prerecorded message?

A    That's what I think it is.

Q    And what about the voicemails?

A    I heard persons offering discounts.  I'm not for certain.  Sometimes they sound prerecorded or computerized automated.

Q    So some of the voicemails you received sound live to you as opposed to prerecorded messages?

MS. KINGSBERY:  Misstates her testimony.

Page 51

You can answer.

THE DEPONENT:  At times I'm forgot for sure if it was a person that left a message, was it a recording, I was hearing both, I thought.

BY MR. DICKERSON:

Q    So some of the calls you received were voicemails left by a live person; right?

MS. KINGSBERY:  Objection.  Misstatement of testimony.

You can answer.

THE DEPONENT:  It sounds like an automated system to me and I don't -- I heard someone offering discounts, so I thought that might be a person.  A telemarketer.

BY MR. DICKERSON:

Q    You also say that the calls forced you to divert attention away from other activities.  Do you see that?  Do you see it?

A    Where is that at?

Q    Last line right there.

A    Yes.

Page 52

Q    What other activities are you referring to?

A    I was getting my hair done and the phone rings and it was them.  I can't say that didn't happen.

Q    And how did it divert your attention?

A    Trying to reach my phone to see if that was an important call that I needed to take.

Q    So what happened as you were getting your hair done?

A    I had to get them to get my phone so I could check it.

Q    Were you able to complete your hair do?

A    Yeah, I just ignored the call.

Q    Any other activities you are referring to here?

A    None that I can recall at this moment.

Q    The last sentence in your response to the interrogatory says, the calls were annoying and a nuisance and a waste of plaintiff's time.

Did I read that correctly?

A    Yes.

Page 53

Q    How did the calls waste your time?

A    I guess to constantly have to check to see who that call is from because my phone is now turned off, so I had constantly come to the phone, I couldn't get regular calls in because most of the time I was getting it from the automated system or robo-calling so I didn't know a call was coming.  So I had to constantly go back and forth looking at my phone to see what was coming in.

Q    Do you keep copies of everything sent to you in this case?

A    I don't.

Q    Do you receive copies of all the documents filed or served in this case?

A    No.

Q    How do you keep with the facts of this lawsuit -- strike that.

How do you keep up with what's going on in the lawsuits?

A    Communications from Amanda and Alex.

Q    And how often do you communicate with them?

**Page 54**

A    They reach out to me or I contact them.

Q    How do they reach out to you?

A    Phone.

Q    They call you?

A    Yes.

Q    How often do they call you?

A    Every few months, months have gone by.

Q    Do you happen what the Telephone Consumer Protection Act is?

A    Do I know what the Telephone Act is?

Q    The Telephone Consumer Protection Act?

A    Protection.

Q    Do you know what it is?

A    Protection.

Q    Are you asking me?

A    No, I'm telling.

Q    Anything else you know about the Telephone Protection Consumer Act?

A    That it protects the consumer.

Q    In what ways?

A    From unwanted calls, yes.

**Page 55**

Q    All right.  Let's take a break.

    (Recess taken at 11:29 a.m.)

                              (11:40 a.m.)

    BY MR. DICKERSON:

Q    How many phone numbers do you have?

A    Two.

Q    What are those numbers?

A    Landline, 443-526-6324.

Q    That's your home phone?

A    Mm-hmm.

Q    Do you share that with anyone else?

A    My husband.

Q    And you said you have two numbers?

A    Cell.

Q    What's your number?

A    410-459-6104.

Q    Do you share that with anyone else?

A    No.

Q    What do you use each of those phones for?  Let's start with your landline?

A    House line.  Just a home phone.

**Page 56**

Q    Do you use it for work at all?

A    No.

Q    Any sort of business?

A    No.

Q    What about your cell phone.  What do you use that for?

A    Personal.

Q    Do you use it for work at all?

A    No.

Q    And you haven't worked since 2016?

A    Correct.

Q    How did you learn that you may have a claim against DentalPlans.com?

A    I filed it.

Q    What do you allege that DentalPlans did wrong?

A    Excessive calling.

Q    Would you have filed this complaint if they had only called you once?

A    No.

Q    What do you allege Cigna did wrong?

**Page 57**

A    I don't recall.  Are they affiliates?

Q    You said you wouldn't have filed this complaint if they only called you once.  Would you have filed it if they called you a five times?

    MS. KINGSBERY:  Objection.  Form.  Speculation.

    You can answer.

    THE DEPONENT:  I filed this complaint because of the numerous calls.

    BY MR. DICKERSON:

Q    Would you have filed it if they called you five times?

    MS. KINGSBERY:  Same objection.

    Still answer.

    THE DEPONENT:  No.

    BY MR. DICKERSON:

Q    You authorized DentalPlans to make calls to your phone; right?

    MS. KINGSBERY:  Objection.  Calls for a legal conclusion.

    You can answer, if you know.

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                    Pages 58..61

Page 58

THE DEPONENT:  I guess in normal proceedings, yes.  For normal communications but not for the robo-calling situation that I experienced, no.

BY MR. DICKERSON:

Q   So just to make sure the record is clear, you told DentalPlans to call your phone; right?

MS. KINGSBERY:  Objection.  Misstating testimony.

You can answer.

THE DEPONENT:  That's what they stated during our call that they would call me.

BY MR. DICKERSON:

Q   I'm asking a different question.  I'm asking whether you told DentalPlans it was okay to call you on your cell phone?

MS. KINGSBERY:  Objection.

You can answer.

THE DEPONENT:  I would say as we're doing business, yes, with one another.

BY MR. DICKERSON:

Q   And you told DentalPlans that they could

Page 59

call you using a prerecorded message; right?

A   No.

Q   You didn't?

A   No, they -- I never talked to them about a prerecorded message.  I don't recall any conversation at all with them for that.

Q   You said that you, correct me if I'm wrong, you just testified that you told them they can call you on your cell phone about normal business information.

Is that what you said?

A   I communicated with them on my cell phone, yes.

Q   Well, I'm asking about whether you told them about your giving them permission to call you on your cell phone?

A   Not directly saying you can call me.

Q   You didn't tell them they could call you on your cell phone?

A   No, it wasn't a conversation where I said, yeah, you can call me.

Page 60

Q   Did you ever tell DentalPlans they cannot call you?

A   I told them that if I should need additional help, that I will contact them.

Q   But did you tell them they could not call you?

A   I said if I needed additional help from you, I would contact you.

Q   I understand that's what you told them.  Did you tell them not to call you?

A   No.

(Bradley Deposition Exhibit 4 marked for identification.)

BY MR. DICKERSON:

Q   I'm handing you what has been marked as Exhibit 4.

Do you recognize this document?  I'll represent to you this is what you produced in this lawsuit.  Do you recognize this document?

A   No, I haven't seen this phone call list.

Q   This reports to be your call reports from

Page 61

September 1st, 2018 through October 12, 2020.

Do you have any reason to believe that's not what this is?

A   Okay, I believe that's what this is.

Q   Have you located any additional records documenting any communications you've had with DentalPlans?

A   On this document?

Q   No.  Do you any other documents that evidence or show your communications with DentalPlans?

A   No.

Q   Do you have any other documents that evidence or show your communications with Cigna?

A   No.

Q   Have you ever received phone calls, any auto-dialer from any other companies?

MS. KINGSBERY:  Objection.  Calls for a legal conclusion as it what an auto-dialer is, but you can answer to the best of your ability.

THE DEPONENT:  No.

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                    Pages 62..65

Page 62

BY MR. DICKERSON:

Q   Have you received phone calls using a prerecorded message from any other company?

A   On the landline, we get the call saying we have a car insurance about to lapse, which isn't true. We get that a lot. And I'm assuming that's prerecorded.

Q   Did you file a lawsuit against any of those companies?

A   No.

Q   Why not?

A   It's here and there.

Q   When did you first contact DentalPlans?

A   2018 November, I recall around that time.

Q   And why did you contact DentalPlans?

A   We were about to switch coverage and I needed some additional coverage until we reenrolled.

Q   Did you contact any other companies seeking coverage?

A   No, we were reviewing.

Q   What do you mean?

Page 63

A   Reviewing on the Internet different companies.

Q   What companies did you review?

A   The ones without a waiting period, Humana, there's different ones. Just reviewing dental plans, actual dental insurance. There's a difference.

Q   Did you purchase dental insurance or a dental plan from DentalPlans?

A   That's a plan; it's not interest.

Q   You contacted them in November of 2018. Did you have more than one conversation with them?

A   Initial contact, and then a follow up.

Q   And you purchased a plan from DentalPlans.com at that time; right?

A   Yes.

Q   So you weren't the actual customer?

A   He purchased it.

Q   And it was purchased in his name?

A   Yes, I believe.

Q   I'm just asking so you're not the actual customer; right?

Page 64

A   He purchased it because I didn't want to use my Visa card over the phone. I'm not comfortable with giving out my information and he did, so that's how we got it.

Q   So his name is on the DentalPlans.com account?

MS. KINGSBERY:  Object to the form.

THE DEPONENT:  Yes.

MR. DICKERSON:  What was wrong with the form of that one?

MS. KINGSBERY:  It was vague.

BY MR. DICKERSON:

Q   Whose name was on the DentalPlans account that your husband purchased?

A   Dennis Bradley and Deborah Bradley.

Q   And your name isn't on the account; correct?

MS. KINGSBERY:  Objection.

THE DEPONENT:  Dennis and Deborah Bradley.

BY MR. DICKERSON:

Q   You just said that.

A   Yes.

Page 65

Q   Your name is on the membership card?

A   Yes.

Q   As the customer?

Did you answer that question?

A   Yes, I had -- I was authorized to use the plan as well.

Q   Right. I understand that you were authorized to use the plan. I'm asking a different question as to whether you were listed as a customer on the account?

MS. KINGSBERY:  What do you mean be customer?

MR. DICKERSON:  I think that's a --

BY MR. DICKERSON:

Q   Was your name on the --

A   Yes.

Q   Okay. So what was your experience with the DentalPlans descriptions?

A   I couldn't find someone, a dentist in the area that actually would allow me to use the discount plan so I called to get more information.

Page 66

Q   Did you ever use the plan?

A   No.

Q   What do you remember about how the plan worked?

A   I was supposed to use a dentist that participated in DentalPlan to get discounts on dental services.

Q   Did your subscription plan automatically review?

A   No.

Q   And you mentioned that your husband purchased a plan with his credit card or bank card?

A   Yes.

Q   Do you recall how much the plan cost?

A   Somewhere around 134 and some change.

Q   Did you renew your plan?

A   No.

Q   Why not?

A   I couldn't use it.

Q   Did you purchase a dental plan from any other company?

Page 67

A   No.

Q   And I'm asking about after your DentalPlans.com plan expired?

A   Not right away.

Q   But subsequently you did?

A   Yes.

Q   What product did you purchase?

A   A PPO.

Q   That's insurance?

A   Insurance.

Q   Would you have renewed your plan if you could use it at your dental providers?

MS. KINGSBERY:  Objection.  Calls for speculation.

You can answer.

THE DEPONENT:  I would have, yes.

BY MR. DICKERSON:

Q   At one point you requested a rate for renewal with DentalPlans; right?

A   Yes.

Q   You didn't say you would renew when your

Page 68

plan expired?

A   No.

Q   So on your initial call or at least one of your calls with DentalPlans in November of 2018, did you provide DentalPlans with your cell phone number at that time?

A   I called using my cell phone, I believe.

Q   And you agreed that DentalPlans had contacted you at that number; right?

A   I don't recall us having a conversation contacting me back at that number.

Q   So you sued DentalPlans for unwanted calls but you don't know whether you told them you wanted those calls.

A   We didn't --

MS. KINGSBERY:  Objection.  Misstates testimony.

THE DEPONENT:  I don't think there was them asking to call me.

BY MR. DICKERSON:

Q   So you don't recall them asking if they

Page 69

could call you?

A   No.

Q   You don't recall them asking if they can call you using prerecorded messages?

A   No.

Q   You're certain of that?

A   I wouldn't have wanted that so I would have opted out if I had the opportunity to opt out.

MR. DICKERSON:  Let's take a break.

(Recess taken at 12:02 p.m.)

(12:11 p.m.)

BY MR. DICKERSON:

Q   I'm being to play you a recording of your call with DentalPlans.

MS. KINGSBERY:  I'm sorry.  Which -- does it -- can we mark it by Bates?

MR. DICKERSON:  Sure.  It's DP00036.

(Recording played.)

BY MR. DICKERSON:

Q   That's your voice, right?

A   Yes.

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                                     **Pages 70..73**

Page 70

(Recording played.)

Q   And that's your phone; right?

A   Yes.

Q   Is that the phone number on which you were receiving calls from DentalPlans that is the subject of this lawsuit?

A   Yes.

(Recording played.)

Q   So that was your voice?

A   Right.  Yes.

Q   And that was you telling DentalPlans that they can call you; correct?

A   Correct.

Q   And that was you telling DentalPlans they can call using a prerecorded voice; right?

A   That was me, yes.

Q   So when you told me earlier that you did not tell them that they could contact you, you were wrong about that; right?

A   Not in that manner.

Q   Well, you said you did not tell them to

Page 71

contact you; right?

MS. KINGSBERY:  Objection.  Misstates testimony.

BY MR. DICKERSON:

Q   Did you testify earlier today that you did not tell DentalPlans that they could contact you?

A   Just normal contact, yes, but not repeated calls, no.

Q   When we were discussing a few minutes ago, did you say anything about a particular manner?

A   Just normal communications would have been fine.

Q   What's normal communication?

A   Occasionally giving a call to update or whatever they needed to talk to me about.  If they needed to contact me, then that would have been fine, but not in the manner that I received those calls.

Q   What do you mean by the manner?  The frequency?

A   Yes, sir.

Q   So that was your concern.  Otherwise, it was

Page 72

okay for them to call you?

MS. KINGSBERY:  Objection.

You can answer.

THE DEPONENT:  I would have opted out of the type of situation.  I would not have given permission to receive calls from an automated system, no.

Q   But you did give permission to receive calls from an automated system; right?

A   That was excessive.

Q   Right.  But you gave permission to receive calls from an automated system; correct?

MS. KINGSBERY:  Objection.  Calls for a legal conclusion.

But you can answer.

THE DEPONENT:  On normal business, not to contact me repeatedly, no.

BY MR. DICKERSON:

Q   Did you tell them they couldn't contact you repeatedly?

A   If they wanted -- if they had provided me an opt out, I would have opted out.

Page 73

Q   But you didn't opt out, did you?

A   I didn't have the opportunity.

Q   But you didn't opt out, did you.

MS. KINGSBERY:  Objection.  Asked and answered.

BY MR. DICKERSON:

Q   Yes or no, did you opt out?

MS. KINGSBERY:  She already answered.

MR. DICKERSON:  No, she did not.

MS. KINGSBERY:  Yes, she did.  You just didn't like it.

MR. DICKERSON:  It's a yes or no question --

MS. KINGSBERY:  You don't get to dictate how she answers it.

MR. DICKERSON:  I do get to demand answers to my question.

MS. KINGSBERY:  You can answer again.  Same objection.

THE DEPONENT:  It wasn't an opportunity to opt out.

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                         Pages 74..77

Page 74

BY MR. DICKERSON:

Q   What do you mean no opportunity?

A   Never asked me did I want to receive or not to receive.

Q   Did you call them and tell them you didn't want to receive?

A   I told them there was no need to contact me.

Q   When did you tell them that?

A   That was during one of the conversations we had, and I said no need for you to contact me.  I'll call you back if I need additional information.

Q   But you didn't tell them not to call you; right?

MS. KINGSBERY:  Objection.  Misstates testimony.

BY MR. DICKERSON:

Q   You didn't tell them, did you?

MS. KINGSBERY:  It's misstating her testimony.

You can answer.

Page 75

BY MR. DICKERSON:

Q   Did you ask them not to call you?

A   There was no need to contact me.  I will contact you if I need additional information is what I stated to them.

Q   And what you did not state was you should not call me; correct?

A   I previously said they could, but I didn't think it's be excessive calling.

Q   Did they ask you if it was okay to send you text messages?

A   I don't recall.

Q   How much money are you seeing from DentalPlans as a result of this lawsuit?

A   Whatever is fair through the jury or the courts.

Q   What do you think is fair?

A   I haven't put on a monetary amount.

Q   How much money are you seeking from Cigna as a result of this lawsuit?

A   The same.  From the jury and courts.

Page 76

Q   Do you expect to receive any other compensation for the time you spent involved in this lawsuit?

A   No.

MR. DICKERSON:  All right.  That's all I have.

MS. KINGSBERY:  If I could just have a few minutes please.

(Recess taken at 12:19 p.m.)

(12:20 p.m.)

EXAMINATION

BY MS. KINGSBERY:

Q   Ms. Bradley, counsel just played for you DP00036.  I'm going to replay that and ask you a couple questions.  All right.  Okay.

(Recording played.)

BY MS. KINGSBERY:

Q   Were you disconnect from that call?

A   No.

(Recording played.)

Q   Did she ask if she could solicit you?

Page 77

A   No.

Q   Did she ask if she could send prerecorded telemarketing calls to your cell phone?

A   No.

Q   Okay.  If she asked you, would you have consented?

A   No.

Q   Okay.  Ms. Bradley, I'm going to jump back a couple hours ago.  You testified that you've talked to myself and Mr. Burke about three to four times; is that correct?

A   Yes.

Q   In that estimate, were you including text messages and emails?

A   No.

Q   Okay.  Have you been in contact with my paralegal?

A   Yes.

Q   How often do yourself and I text or email?

A   What?

Q   How often do you and I send text messages to

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                                  Pages 78..81

Page 78

each other?  I will strike that.  I will ask it in a different way.

If where you were to include total contact, not just verbal communications, how often would you say you've communicated with myself?

A    Probably about six times, seven times.

Q    Okay.  Have often have you spoken with my paralegal?

A    Often.

Q    Often.  Can you clarify what often means from your understanding of the term?

A    Repeated communications back and forth.

Q    Okay.  Have there been instances where you have reached out for a status of your case and our response was that nothing had changed?

A    Yes.

Q    Okay.  Have you sent emails back and forth to Mr. Burke?

A    Yes, I have.

Q    Okay.  Ms. Bradley, did you locate myself to represent you in this case?

Page 79

A    Yes.

Q    Have you responded to discovery requests in this case?

A    I'm sorry.

Q    The interrogatories we spoke about?

A    Yes.

Q    Did you provide us answers to those interrogatories?

A    Yes.

Q    Have we asked you to collect information and documents related to this case?

A    Yes.

Q    Have you provide those to my firm or Mr. Burke's?

A    Yes.

Q    Are you sitting for deposition here today?

A    Yes.

Q    Okay.  So is it accurate to say you've done nothing in this lawsuit?

A    It's not accurate.

Q    Okay.  Earlier, Ms. Bradley, you were asked

Page 80

about Exhibit 3.  Let's turn to that.  I want to make sure I understand your response to counsel's questions.

Did you provide to my office answers to the questions identified as defendant's interrogatory to plaintiff?

A    Yes.

Q    Okay.  But you did not necessarily compose this final draft that we are sitting here today?

A    Correct.

Q    Okay.  But the information and facts came from who?

A    From myself.

Q    Okay.  Do you recall, Ms. Bradley, if DentalPlans continued calling you after your plan had lapsed?

A    Yes.

Q    Okay.  Do you know when your plan lapsed?

A    I believe December 2019.

Q    Okay.  So if they called you after December 2019 --

Page 81

A    December 1, 2019.  That's the end of the plan.

Q    Did you get any call in the year 2020?

A    Yes.

Q    Okay.  And that's when you were no longer a customer of DentalPlans?

A    Correct.

Q    What was the purpose of those calls?

A    To purchase a plan.

Q    They wanted you to purchase a plan?

A    Yes.

Q    Okay.  Ms. Bradley, we earlier talked about Exhibit No. 2.  Do you still have that in front of you?

A    Yes.

Q    Okay.  You testified that you had not seen that document before; correct?

A    Correct.

Q    Okay.  Were you advised that an amended complaint was being filed in your case?

A    Yes.

**DEBORAH BRADLEY vs DENTALPLANS.COM, ET AL.**
**Deborah Bradley on 02/08/2023**                              Pages 82..83

**Page 82**

Q   Okay.  Was it any surprise to you today to see the amended complaint?

A   No.

Q   Okay.

MS. KINGSBERY:  I have nothing further.

MR. DICKERSON:  Us either.

(With signature waived, the Deposition of Deborah Bradley concluded at 12:28 p.m.)

**Page 83**

REPORTER'S CERTIFICATE

STATE OF MARYLAND

COUNTY OF BALTIMORE

I, Jeaninn Y. Alexis, a Notary Public of the State of Maryland, County of Baltimore, do hereby certify that the with-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me, and that this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties nor in any way interested in the outcome of the action.

As witness my hand and seal this 19th day of February, 2023.

_____
JEANINN ALEXIS
My Commission Expires: 12/12/2024