**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

DEBORAH BRADLEY, individually and on
behalf of others similarly situated,
     Plaintiff,

v.

DENTALPLANS.COM and
CIGNA HEALTH AND LIFE
INSURANCE COMPANY,
     Defendants.

                              /

Case No. 1:20-cv-1094-BAH

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DENTALPLANS' RECONSIDERATION MOTION** [Dkt. 166]

Peter A. Holland (Fed. Bar No. 10866)
THE HOLLAND LAW FIRM, P.C.
914 Bay Ridge Rd., Ste. 230
Annapolis, MD 21401
(410) 280-6133
Peter@HollandLawFirm.com

Alexander H. Burke (*pro hac vice*)
**BURKE LAW OFFICES, LLC**
909 Davis St., Suite 500
Evanston, IL 60201
(312) 729-5288
ABurke@BurkeLawLLC.com

William (Billy) Peerce Howard (*pro hac vice)*
THE CONSUMER PROTECTION FIRM
401 E. Jackson Street, Suite 2340
Tampa, FL. 33602
(813) 500-1500
Billy@TheConsumerProtectionFirm.com

Amanda Allen
Amanda Allen Advocacy, PLLC
610 E Zack St., Sui 110-2300
Tampa, FL 33602
(727) 488-7202
Amanda@AllenAdvocacy.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................1

I.    FACTS ...........................................................................................................2

II.    JUDICIAL DEFERENCE TO AGENCY REGULATIONS .........................................4

    A.  A Brief History ..................................................................................4

    B.  The Loper Test ...................................................................................6

III.    THE TCPA'S WRITTEN CONSENT REQUIREMENT FOR ROBOCALLS
EASILY PASSES THE LOPER TEST. .......................................................................9

    A.  *Loper* Test Part I: Congress Delegated
Authority for the FCC to Require Written .............................................. 9
Consent for Telemarketing Robocalls.

    B.  *Loper* Test Part II: The FCC did as
Congress Instructed in Adopting a
"written Consent" rule for robocalls. ................................................... 15

    C.  Loper Test Part III: The FCC's 2012
"Written Consent" Requirement was Based
upon Sound Research, Experience, Expertise and Analysis. .............. 15

    D.  DentalPlans' Motion is Based upon Stale Law .................................... 20

    E.  Written Consent is Consistent with Express Consent. ........................ 23

IV.    THE COURT SHOULD NOT DISTURB ITS PRIOR SUMMARY
JUDGMENT AND CLASS CERTIFICATION RULINGS. ....................................30

CONCLUSION...........................................................................................................30

APPENDIX A – Side-by-Side Comparison of TSR and TCPA Written Consent for Robocall
Regulations

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Adamcik v. Credit Control Servs.*, 832 F. Supp. 2d 744 (W.D. Tex. 2011) ...................................27

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003) ..............................................................11

*Brock v. Pierce Cnty.*, 476 U.S. 253, 265 (1986) ...........................................................................11

*Chevron v. Nat. Res. Def. Coun.*, 467 U.S. 837 (1984)..................................................1, 5, 6, 7, 25

*Corner Post, Inc. v. Board of Governors*, 603 U. S. 799 (2024) ......................................................5

*Gutierrez v. Barclays Grp.*, 2011 WL 579238,
     2011 U.S. Dist. LEXIS 12546 (S.D. Cal. Feb.9, 2011) ......................................................27

*Insurance Marketing Coalition v. FCC*, 127 F.4th 303 (11th Cir. 2025).......................................20

*Leckler v. CashCall, Inc.*, 554 F. Supp. 2d 1025, 1031
     (N.D. Cal. 2008) ("*Leckler I*"), rev'd on reconsideration,
     2008  WL 5000528 (N.D. Cal. Nov. 21, 2008) ("*Leckler II*") ..................................... 24-26

*Livingston v. U.S. Bank, N.A.*, 58 P.3d 1088, 1091 (Colo. App. 2002) ..........................................28

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).......................................................*Passim*

*Mclaughlin Chiropractic Assocs., Inc. v. Mckesson Corp.*, 606 U.S. 146 (2025) .................*Passim*

*Nicoletti v. Bayless*, No. 24-6012, 2025 WL 80294 (4th Cir. Jan. 13, 2025).................................15

*Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-cv-2902-CLS,
2012 WL 5511039, 2012 U.S. Dist. LEXIS 160938 (N.D. Ala. Nov. 9, 2012)............................28

*Satterfield v. Simon & Schuster, Inc.*, 2007 WL 1839807 (N.D.Cal. June 26, 2007) ...................25

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) .............................................26

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)...................................................................5, 7, 8, 15

*United States v. Am. Trucking Ass'ns*, 310 U.S. 534 (1940)............................................................9

## Federal Communications Commission Orders

In re TCPA 2002 NPRM, 17 F.C.C. Rcd. 17459 (2002)..............................................................12

In re TCPA 2003, 18 FCC Rcd. 14014 (2003) .......................................................................15, 16

In re TCPA 2008, 23 F.C.C. Rcd. 559, 560 (2008) ................................................................. 24-25

In re TCPA 2012, 27 F.C.C. Rcd. 1830 (2012) .......................................................*Passim*


**Statutes and Regulations**

16 C.F.R. § 310.4(b), ...........................................................................................................3, 13, 15

42 U.S.C. § 6295(i)(6)(A)(v) ...............................................................................................11

47 U.S.C. § 227(b)(1)(A)(iii)...............................................................................23, 24, 27

47 U.S.C. § 227(b)(2) ...........................................................................................................11

47 U.S.C. § 227(c)(1)............................................................................................................10

47 U.S.C. § 227(c)(2)............................................................................................................24

47 U.S.C. § 227(c)(5)............................................................................................................10

47 C.F.R. § 64.1200(a)(1) ....................................................................................................1

47 C.F.R. § 64.1200(a)(2)......................................................................................................14

47 C.F.R. § 64.1200(c)(2)(ii)................................................................................................13

DNCIA................................................................................................................................14, 15, 20


**Legislative Materials**

H.R.Rep 102-317-1991, § 2 11 5-9.......................................................................................23

DNCIA, PL 108–10, March 11, 2003, 117 Stat 557............................................................*Passim*


**Secondary Sources**

Black's Law Dictionary (12th ed. 2024) ..............................................................................23

DentalPlans made many thousands of telemarketing robocalls to the cell phones of Plaintiff and tens of thousands of other similarly situated Americans. On June 6, 2024, this Court denied defendant DentalPlans' summary judgment motion on the issue of whether it had consent to make the calls, and granted Plaintiff's motion for class certification. Dkt. 138 ("SJ Order"). The summary judgment ruling was based upon the Court's finding that DentalPlans was required to have obtained "prior express written consent" for its robocalls, because that is the standard the FCC set for telemarketing robocalls. SJ Order at 11-13; 47 C.F.R. § 64.1200(a)(2).

DentalPlans has filed a reconsideration motion arguing that the Supreme Court's *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) and *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025), decisions require reversal of the Court's summary judgment opinion on the ground that the TCPA's regulations requiring "prior express written consent" for telemarketing robocalls, 47 C.F.R. § 64.1200(a)(1), runs inconsistent with the plain language of the statutory phrase, "prior express consent" in 47 U.S.C. § 227(b)(1)(A), because it adds a word – "written" – to the statutory language. Because of this DentalPlans incorrectly posits that the regulatory phrase cannot be squared with the statutory phrase, and because *Loper* and *McLaughlin* eviscerated *Chevron* deference in favor of judicial review of plain statutory language, the Court must reverse its summary judgment and class certification rulings prior ruling and find .

DentalPlans is wrong. While it is true that *Loper* overruled *Chevron*, it did not launch administrative law into a directionless abyss where district courts are free to

invalidate agency regulations if they perceive tension with a statutory provision. Instead, *Loper* requires a measured analysis of whether the agency acted appropriately within its statutory delegation in issuing the regulation:

> Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority…. Careful attention to the judgment of the Executive Branch may help inform that inquiry.
>
> And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024) (cleaned up; paragraph breaks supplied).

> Courts exercising independent judgment in determining the meaning of statutory provisions… may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes.
>
> When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court … is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits.
>
> The court fulfills that role by [1] recognizing constitutional delegations, [2] fixing the boundaries of the delegated authority, and [3] ensuring the agency has engaged in reasoned decisionmaking within those boundaries.

*Loper*, 603 U.S. at 395 (cleaned up; paragraph breaks supplied). The final quoted sentence above provides the roadmap for considering whether the FCC's "prior express written consent" requirement should stand.

McLaughlin is *Loper's* sister case, which considered the *Loper* framework in the context of FCC regulations specific to the TCPA and clarified that – despite the Hobbs Act – district courts must apply the *Loper* analysis: first ask whether Congress delegated discretion to the FCC in the subject domain, second consider whether the

2

FCC acted within those boundaries, and third – with appropriate respect to the FCC's interpretation – consider the narrow question of whether the agency engaged in "reasoned decisionmaking within [congressionally delegated] boundaries." *Loper*, 603 U.S. at 395; *McLaughlin*, 606 U.S. at 155.

As explained below, congressional delegation for "written consent" arises from the Do-Not-Call Implementation Act ("DNCIA")'s[1] mandate that the FCC issue regulations to "maximize consistency" with the Federal Trade Commission's Telemarketing Sales Rule, 16 C.F.R. § 310.4(b). The FCC stayed within its congressionally-prescribed guiderails and did the necessary diligence and consideration to properly support its written consent regulation.

DentalPlans' motion does not do any of the above analy1sis, and does not cite, reference or *mention* statutory delegation *at all*, much less address the statutory authority under which the FCC issued the regulation. For these reasons, and the reasons explained below, the Court should deny DentalPlans' reconsideration motion.

## I.    FACTS

Defendant DentalPlans operates a direct-to-consumer marketplace that offers discounts for certain visits to the dentist for a monthly fee. Defendant Cigna underwrites some such discount plans. DentalPlans/Cigna Marketing Agreement, Dkt. 61-8. When potential customers sign up for DentalPlans' discount service on the telephone, its agents use a script to guide the interaction. Script, Dkt. 108-4 at

---

[1]    PL 108–10, March 11, 2003, 117 Stat 557. The DNCIA can be reviewed at: https://www.congress.gov/bill/108th-congress/house-bill/395/text.

DP000013-14; Keen Depo., Dkt. 108-5 at 26:18-27:8. That script asked for the consumer's phone number "in case we get disconnected," Script, Dkt. 108-4 at DP000013-14, and nowhere does the script ask the consumer whether they wish to receive telemarketing calls, much less *prerecorded* telemarketing calls. *Id.* Instead it asks the consumer whether they would like to receive promotions via text message, *only. Id.*[2]

DentalPlans' liability in this action hinges upon whether its script gathers the consumer's consent sufficient to permit DentalPlans to make prerecorded message telemarketing calls ("robocalls") to its customers after their plans expire. According to the class list DentalPlans has produced, it made 96,846 such robocalls to 66,652 former customers' cell phones.

Plaintiff Deborah Bradley is a Maryland consumer who signed up for a DentalPlans discount service on November 26, 2018, over the phone. *Bradley Decl.,* Dkt. 108-9 at ¶4. Dissatisfied with the product, Plaintiff allowed the plan to expire. Bradley Depo., Dkt. 124-10 at 66:1-19. Beginning in September 2019, DentalPlans began robocalling Plaintiff's cell number to try to get her to renew her plan; Bradley received at least ten such calls after her plan had terminated on December 1, 2018. *Bradley Decl.,* Dkt. 108-9 at ¶6; Call Log, 124-9.

## II.     <u>JUDICIAL DEFERENCE TO AGENCY REGULATIONS</u>.

---

[2]     DentalPlans similarly induced Plaintiff into "consenting" to its prerecorded telemarketing calls through bait-and-switch: it told Plaintiff it would use her number to robocall "to keep you updated with any plan information," only, and now argues that her acquiescence conferred consent to robocall her for telemarketing purposes. Trans. of Nov. 26, 2018 Call, Dkt. 111-6 at 2:21-3:13.

### A. A Brief History.

Pursuant to the directive in *Chevron v. Nat. Res. Def. Coun.*, 467 U.S. 837 (1984), until recently courts were required to defer to agency interpretations of ambiguous statutes, so long as Congress had duly authorized the agency to administer. Orders issued by the FCC were an exception to *Chevron*. Pursuant to the "Hobbs Administrative Orders Review Act of 1950" (Hobbs Act). FCC orders were entitled to a sort of "super" deference in district courts, because the Hobbs Act vested exclusive jurisdiction to determine the validity of final FCC orders in the U.S. Courts of Appeal. Under the Hobbs Act, a party wishing to challenge an FCC order or regulation was required to initiate an original proceeding in a U.S. Court of Appeals within sixty days after the entry of the FCC's final order.

However, a trio of recent decisions from the Supreme Court have changed the landscape substantially. Most importantly, on June 28, 2024, the Court decided *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024) ("*Loper*"), which overruled *Chevron* deference in favor of a test akin to *Skidmore* deference, discussed below. The *Loper* test is now controlling law with regard to consideration of how much weight courts should give agency-issued regulations and final orders.

Three days later, *Corner Post, Inc. v. Board of Governors,* 603 U. S. 799 (2024) ("*Corner Post*"), came down. *Corner Post* held that a private party "may always assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them," and eviscerated the Administrative Procedure Act's requirement that a challenge to a regulation must happen within 60 days of the

issuance of an agency final order or regulation. Instead, such a challenge must be made within the statute of limitations after a cause of action accrues in the ordinary course.

*McLaughlin Chiropractic Assoc., Inc. v. McKesson Corp.*, was a TCPA junk-fax case decided June 20, 2025. McLaughlin overruled Hobbs Act deference for TCPA cases in favor of the *Loper* test. As *McLaughlin* put it, a district court:

> … must independently determine for itself whether the agency's interpretation of a statute is correct.

> District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation.

*McLaughlin*, 606 U.S. at 146.

### B. The *Loper* Test.

Parties wishing to challenge an FCC regulation, as DentalPlans does, must use the framework and test the Supreme Court established in *Loper*. Justice Roberts sets a roadmap for consideration of such a challenge:

> When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court [is] to independently interpret the statute and effectuate the will of Congress subject to constitutional limits.

> The court fulfills that role by [1] recognizing constitutional delegations, [2] fixing the boundaries of the delegated authority, and [3] ensuring the agency has engaged in " 'reasoned decisionmaking' " within those boundaries,

*Loper*, 603 U.S. at 395 (cleaned up; paragraph breaks supplied). *Loper* restates this test in its holding at the end of the decision:

> *Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.

Careful attention to the judgment of the Executive Branch may help inform that inquiry.

And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.

*Loper*, 603 U.S. at 412-13 (paragraph breaks supplied). Given the above, *Loper* requires a district court considering a challenge to a regulation in a civil suit to engage in the following test:

1. Examine Statutory Delegation. The Court must first identify the statutory delegation for the challenged regulatory language.

2. Determine the Outer Limits of Congressional Authority. Next, the Court examines whether the challenged regulation honors or exceeds such Congressional delegation.

3. Cross-Check Agency's Decisionmaking. Third, the Court must consider whether, in adopting the regulation or interpretation, the FCC engaged in reasoned decisionmaking within constitutional boundaries.

*Loper* overruled the *Chevron* standard of deference, and replaced it with the deference afforded agency decisions articulated in *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944), as the better, correct, standard going forward. In doing so, the court noted that an agency's expertise, diligence and history of administering regulations under a statute are *always* relevant:

Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch.

*Loper*, 603 U.S. at 403.

In an agency case in particular, the court will go about its task with the agency's 'body of experience and informed judgment,' among other information, at its disposal.

> And although an agency's interpretation of a statute cannot bind a court, it may be especially informative to the extent it rests on factual premises within the agency's expertise."
>
> Such expertise has always been one of the factors which may give an Executive Branch interpretation particular power to persuade, if lacking power to control.

*Loper*, 603 U.S. at 402 (quotation marks, internal modification, and citations omitted, paragraph breaks supplied). Justice Roberts provides a list of considerations for determining how much weight to afford an Agency interpretation:

> The informed judgment of the Executive Branch could be entitled to "great weight."
>
> The weight of such a judgment in a particular case… depend[s] upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

Loper, 603 U.S. at 402.

Thus, reviewing courts are to look at the statute, and the history of the regulation, noting the agency's finding and consistency of its interpretations of the statute. *Loper* describes *Skidmore* deference as based on an evaluation of the "'interpretations and opinions' of the relevant agency, 'made in pursuance of official duty' and 'based upon ... specialized experience,' which 'constitute[d] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions." *Loper*, 603 at 388 (modification in original) (quoting *Skidmore*, 323 U.S. at 139-140).

Citing previous Supreme Court decisions as appropriate models for reviewing agency decisions, *Loper* noted "[T]he informed judgment of the Executive Branch— especially in the form of an interpretation issued contemporaneously with the

8

enactment of the statute—could be entitled to 'great weight." *Id.* at 388 quoting *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 549 (1940).

*Loper* also instructs courts to recognize when Congress has left it to an agency to "give meaning to a particular statutory term" or "fill up the details of a statutory scheme." *Id.* at 394-395 (quotation marks omitted). In these situations, the reviewing court is required to respect the agency's discretion because Congress delegated such discretion and provided the agency with flexibility to implement regulations to achieve congressional goals. *Id.* at 395.

*Loper* does not mention the words "plain words" or "plain text" to describe how a court should evaluate the legality of an agency's rule. Relying solely on the statutory text to determine the propriety of agency rules and orders does not comport with the *Loper* framework.

Rather, the Court should consider and respect the discretion Congress provided to agencies to implement the statute, as well as congressional directives to accomplish the statute's goals.

III.    **The TCPA's Written Consent Requirement for Robocalls Easily Passes the *Loper* Test.**

    A.    ***Loper* Test Part I: Congress Delegated Authority for the FCC to Require Written Consent for Telemarketing Robocalls.**

When considering congressional delegation, one looks to the statute. When Congress passed the TCPA in 1991 it expressly delegated to the FCC the task of figuring out how to protect residential telephone subscribers from unwanted telephone solicitations:

(c)(1) Rulemaking proceeding required

> Within 120 days after December 20, 1991, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The proceeding shall—
>
> (A) *compare and evaluate alternative methods and procedures…*
>
> . . .
>
> (E) *develop proposed regulations* to implement the methods and procedures *that the Commission determines are most effective and efficient to accomplish the purposes of this section.*
>
> (2) Regulations    Not later than 9 months after December 20, 1991, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

47 U.S.C. §§ 227(c)(1)(A), (E). These provisions authorize the FCC to issue regulations pursuant to 47 U.S.C. § 227(c), the private right of action for which is at 47 U.S.C. § 227(c)(5). Congress' directive in that regard is crystal clear: the FCC was required to initiate a rulemaking to compare and evaluate different methods and procedures to determine the most effective and efficient ways to empower Americans to avoid receiving unwanted telephone solicitations.

This an unmistakable congressional delegation of rule writing authority to the FCC to protect subscribers from unwanted telemarketing calls. Congress identified its goal of protecting consumers from unwanted telemarketing, and directed the FCC to "fill in the details" on how to accomplish such, within the guiderails of efficiency, efficacy and economics.

This congressional delegation is still active. Although the statutory language provided a deadline of 120 days from December 20, 1991, for the FCC to issue these

regulations, the general rule is that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003); *see also Brock v. Pierce Cnty.*, 476 U.S. 253, 265 (1986) (agency's failure to act within 120 days did not divest authority, and stating: "The 120-day provision was clearly intended to spur the Secretary to action, not to limit the scope of his authority.")

Congress could have, *but did not*, specify that after the 120th day deadline the FCC would lose the authority to conduct further rulemaking or that some other consequence would flow.[3] The TCPA contains no statutory "consequence" if the FCC did not act until after the 120 deadline, and the statutory language gives no hint that Congress might have intended that the authority it delegated to expire. Under these circumstances, Courts do not enforce congressional deadlines, and the rulemaking authority in the original text persists until congress takes it away. *Barnhart,* 537 U.S. at 159.

The FCC issued its written consent regulations for telemarketing robocalls to cellular phones pursuant to an express delegation in § 227(b)(2) to fill in the terms of its regulations to protect consumers from unwanted telemarketing calls made with a prerecorded or artificial voice. In 2003 Congress amended the TCPA through the Do Not Call Implementation Act, ("DNCIA"), which expanded the FCC's authority to

---

[3]     *Compare e.g.,* 42 U.S.C. § 6295(i)(6)(A)(v)(creating a backstop requirement if agency fails to complete rulemaking).

implement § 227(b), the private right of action for which arises from 47 U.S.C. § 227(b)(3), at issue in this case. The DNCIA directed that the FCC complete the rulemaking proceedings that were already in progress pursuant to the FCC's Notice of Proposed Rulemaking ("NPRM"). *In re TCPA 2002 NPRM*, 17 F.C.C. Rcd. 17459 (2002). Congress mandated that the FCC finish its rulemaking pursuant to the 2002 NPRM and:

> shall issue a final rule implementing the [Do Not Call consult and coordinate with the Federal Trade Commission to maximize consistency [between the TCPA and the TSR,] 16 CFR § 310.4(b).

DNCIA at ¶3 (emphasis added). It is manifest that Congress intended to delegate to the FCC the power to require written consent. Indeed, the 2002 NPRM congress references in the DNCIA *specifically mentions* the TSR's "written consent" proposal.

> We also seek comment on whether the Commission should adopt any new rules or revise any of its existing rules to remain consistent with the proposals of the FTC.
>
> For example, the FTC proposes that consumers who have placed themselves on the national do-not-call registry "could allow telemarketing calls from or on behalf of specific sellers, or on behalf of charitable organizations, by providing express verifiable authorization to the seller, or telemarketer making calls on behalf of a seller or charitable organization, that the consumer agrees to accept calls from that seller or telemarketer."
> ***
> > Fn 201: The FTC proposes two means of obtaining the express verifiable authorization of a consumer to receive telemarketing calls despite that consumer's inclusion on the national do-not-call list: (1) written authorization including the consumer's signature; and (2) oral authorization that is recorded and authenticated by the telemarketer as being made from the telephone number to which the consumer is authorizing access.

*In re TCPA 2002 NPRM*, 17 F.C.C. Rcd. 17459, 17492; ¶58 & fn. 201 (2002). The FTC's final regulation at 16 C.F.R. § 310.4(b), included the exception for written

12

consent, but not oral consent. TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B)(1) (emphasis added);

*see Appendix A.*

The FCC, too, completed its associated rulemaking in 2003, and as congress directed, issued an order harmonizing the TCPA and TSR by allowing written "prior express permission or invitation" to be a defense to violations of the newly-formed Do Not Call Registry:

> Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:
>
> **It has obtained the subscriber's prior express invitation or permission**. Such permission must be evidenced by a **signed, written agreement** between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed

47 C.F.R. § 64.1200(c)(2)(ii) (emphasis added). The FCC succeeded in harmonizing the TCPA with the TSR, with regard to written consent.

In 2008, the FTC updated the TSR, 16 C.F.R. § 310.4(b) – the same paragraph with which Congress expressly directed that the FCC "shall" coordinate in the DNCIA – to require written consent for prerecorded telemarketing calls. See *Appendix A*, Comparison of TSR and FCC Written Consent Regulations.[4]

It took the FCC a few years to do so, but in 2012 it coordinated the TCPA's regulations governing prerecorded telemarketing calls with the FTC's 2008 version, so that the TCPA prohibited all telemarketing robocalls to cellular telephones, unless

---

[4] FTC's statement of basis and purpose for the amendment is available at: https://www.ftc.gov/sites/default/files/documents/federal_register_notices/telemarketing-sales-rule-16-cfr-part-310/080829tsr.pdf.

there was "prior express written consent." *In re TCPA 2012*, 27 F.C.C. Rcd. 1830, 1831 (2012). "We revise our rules to require prior express written consent for all autodialed or prerecorded telemarketing calls to wireless numbers…" *In re TCPA 2012*, 27 F.C.C. Rcd. 1830, 1831 (2012).

The FCC's new regulation is the one at issue in this matter, and was issued pursuant to the authority delegated in the DNCIA's § 3, to consult and coordinate with the FTC:

> Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to [a cellular telephone,] other than a call made with the prior express written consent of the called party…

47 C.F.R. § 64.1200(a)(2); see also, *In re TCPA 2012*, 27 F.C.C. Rcd. 1830, 1836, ¶ 15 (2012) (identifying DNCIA as the authority to issue this regulation). Had the FCC failed to require written consent for prerecorded telemarketing calls, it would have disobeyed the requirements Congress had imposed on it to achieve maximum coordination with the TSR.

**B. *Loper* Test Part II: The FCC did as Congress Instructed in Adopting a "written Consent" rule for robocalls.**

Next, the Court examines whether the challenged regulation honors or exceeds such Congressional delegation. In this case, it is manifest that the FCC acted well within the guiderails, requirements and purpose that Congress placed on its delegation. The DNCIA directed the FCC to harmonize the TCPA with the TSR. DNCIA § 3. In 2012, the FCC did so. Comparing the TSR's written consent requirement with the TCPA's requirement demonstrates this:

14

In comparing the prohibition against making prerecorded message calls to cellular telephones, and in particular the requirements for consent, it is clear that the FCC squarely succeeded in coordinating its written consent for telemarketing robocall regulations with 16 C.F.R. § 310.4(b). DNCIA, § 3.

### C. *Loper* Test Part III: The FCC's 2012 Addition of "Written Consent" was thoroughly Researched and Thought-Through.

The "weight that courts afford an agency's interpretation depends upon the thoroughness evident in the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Nicoletti v. Bayless*, No. 24-6012, 2025 WL 80294, at *2 (4th Cir. Jan. 13, 2025) (citing *Loper* and applying *Skidmore* deference test). "Other factors used to assess a rule's persuasiveness include "the degree of the agency's care, its consistency, formality, and relative expertness." *Id*.

The FCC's 2003 and 2012 rulemakings were extensive, and substantially based on the express authority Congress provided the FCC "to protect consumers from unwanted telemarketing calls pursuant to the TCPA." *In re TCPA 2012*, 27 FCC Reg. 1830, 1831, ¶1 (2012). Both rulemakings were also expressly issued to "maximize consistency with the [FTC's] analogous Telemarketing Sales Rule (TSR), as contemplated by the Do-Not-Call Implementation Act." *In re TCPA 2012*, 27 FCC Reg. 1830, 1831, ¶1 (2012), see also *In re TCPA 2003*, 18 FCC Rcd. 14014, 14027, ¶ 15 (2003) (same).

The FCC did not take its congressionally-mandated job of establishing maximum consistency between the TSR and the TCPA lightly. Its 2003 Order

15

resulted from the FCC's extensive assessment of different types of rules that would "provide consumers with several options for avoiding unwanted telephone solicitations." *In re TCPA 2003*, 18 FCC Reg. 14014, 14014, ¶1 (2003). The 2003 rulemaking evaluated the marketplace and the increase in unwanted telephone solicitations by telemarketers since the agency's previous order had issued in 1992, and noted:

> As required by section 227(c)(1)(A), we have compared and evaluated the advantages and disadvantages of certain alternative methods to protect consumer privacy including the use of network technologies, special directory markings, and company-specific lists in adopting a national do-not-call database.

*In re TCPA 2003*, 18 FCC Reg. 14014, 14041, ¶39 (2003). The FCC observed that the TSR, 16 C.F.R. § 310.4(b), "requires that [the consumer's] express agreement [must] be evidenced by a signed, written agreement." *In re TCPA 2003*, 18 FCC Rec. 14014, 14032, ¶ 23 (2003).

The FCC's 2012 written consent rule for prerecorded message calls to cellular telephones was "[b]ased on substantial record support, [and] the volume of consumer complaints [the FCC] continue[s] to receive concerning unwanted, telemarketing robocalls." *In re TCPA 2012*, 27 FCC Rcd. 1830, 1838 ¶¶ 20-34 (2012). Regarding the need for the rule applying the requirement for a writing to prerecorded telemarketing calls, the FCC explained:

> By enacting the TCPA and its prohibitions on unwanted calls, congress has already made an assessment that the benefits of protecting consumer privacy are substantial.

> Congress, through enactment of a second law - the DNCIA - has further determined that there are substantial benefits to consistency in telemarketing regulations by the Commission and the FTC.
>
> We further find that the significant ongoing consumer frustration reflected in our complaint data and the positive consumer response to the FTC's proceeding confirm the need to strengthen our current rules in some respects, and narrow them in others where other legal protections are in place.

*In re TCPA 2012*, 27 FCC Reg. 1830, 1837, ¶19 (2012) (paragraph breaks supplied).

The FCC even *explicitly stated* that its written consent requirement for prerecorded

calls to cellular telephones:

> would advance Congress' objective under the DNCIA to harmonize the Commission's rules with those of the FTC.
>
> As stated previously, the DNCIA provides that "the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the telemarketing rule promulgated by the Federal Trade Commission."
>
> Eliminating the differences between our rules and those of the FTC where warranted will "maximize consistency" with the FTC's consent requirements.

*In re TCPA 2012*, 27 FCC Rcd. 1830, 1839, ¶23 (2012) (paragraph breaks supplied).

The FCC also noted that Congress had given it discretion to define the *form* that

express consent that should be required for these calls:

> [T]he TCPA is silent on the issue of what form of express consent - oral, written, or some other kind - is required for calls that use an automatic telephone dialing system or prerecorded voice to deliver a telemarketing message.
> Thus, the Commission has discretion to determine, consistent with Congressional intent, the form of express consent required.
> The vast majority of commenters support harmonizing our rules with those of the FTC by adopting a written consent requirement for autodialed or prerecorded telemarketing calls to wireless numbers and residential lines.

*In re TCPA 2012*, 27 FCC Reg. 1830, 1838, ¶21 (2012) (paragraph breaks supplied).

Applying its research, experience, expertise and the response of the public to

its NPRM, the FCC reasoned that a heightened consent standard for prerecorded

17

telemarketing robocalls was proper for numerous reasons. First, the Commission

found that such a rule was consistent with Congress' findings in enacting the TCPA:

> Among the findings Congress made when adopting the TCPA were that: (1) the use of the telephone to market goods and services to the home and to other businesses has become pervasive due to the increased use of cost-effective telemarketing techniques; (2) telephone subscribers considered automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy; and (3) individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals yet permits legitimate telemarketing practices. [*In re TCPA 2012*, 27 FCC Rcd. at 1838, ¶24.]

The FCC next found "regular" insufficient to curb the onslaught of robocalls:

> While current regulations provide a measure of consumer protection from unwanted and unexpected calls, the complaint data, as noted above, show that the proliferation of intrusive, annoying telemarketing calls continues to trouble consumers. We conclude that requiring prior express written consent for telemarketing calls utilizing autodialed or prerecorded technologies will further reduce the opportunities for telemarketers to place unwanted or unexpected calls to consumers. [*Id.*]

The Commission then found that requiring informed *and written* consent to receive

*prerecorded telemarketing* would better protect consumers and reduce confusion:

> We believe that requiring prior written consent will better protect consumer privacy because such consent requires conspicuous action by the consumer -- providing permission in writing -- to authorize autodialed or prerecorded telemarketing calls, and will reduce the chance of consumer confusion in responding orally to a telemarketer's consent request. We further find that the unique protections for wireless consumers contained in the TCPA supports requiring prior written consent for telemarketing robocalls. [*Id.* ¶25]

The Commission also determined that telemarketing robocalls to cell phones are

particularly intrusive, such that heightened protections are appropriate:

18

> Because section 227(b)(1)(A) of the Act specifically protects wireless users, among others, from autodialed or prerecorded calls to which they have not consented, we must ensure that our rules address privacy issues for wireless consumers. In addition, we note that the substantial increase in the number of consumers who use wireless phone service, sometimes as their only phone service, means that autodialed and prerecorded calls are increasingly intrusive in the wireless context, especially where the consumer pays for the incoming call. Further, the costs of receiving autodialed or prerecorded telemarketing calls to wireless numbers often rests with the wireless subscriber, even in cases where the amount of time consumed by the calls is deducted from a bucket of minutes. Given these factors, we believe that it is essential to require prior express written consent for autodialed or prerecorded telemarketing calls to wireless numbers. [*Id.*]

Finally, the FCC specifically rejected the notion that oral consent – or consent without mention of telemarketing specifically – might be sufficient:

> Consumers who provide a wireless phone number for a limited purpose -- for service calls only -- do not necessarily expect to receive telemarketing calls that go beyond the limited purpose for which oral consent regarding service calls may have been granted. Moreover, as use of wireless numbers continues to increase, we believe that increased protection from unwanted telemarketing robocalls is warranted.

*In re TCPA 2012*, 27 FCC Rcd. 1830, 1839-40, ¶ 25 (2012) (emphasis and paragraph breaks supplied). *Loper* requires that a reviewing court look at the process – explained above – that the agency went through to determine what the regulation should be, evaluate it based on the discretion specifically permitted the agency by the statute, and determine whether the regulation was appropriate within the confines of the statutory authority granted. *Loper*, 603 U.S. at 395. The FCC did its job.

Congress delegated to the FCC the duty to define how residential subscribers should be protected from unwanted telemarketing calls in § 227(c), and also delegated a duty to implement the TCPA's restrictions on prerecorded calls in § 227(b)(2). By

19

passing the DNCIA in 2003, Congress also instructed the FCC to maximize consistency of its rules regarding prerecorded calls with those issued by the FTC in the TSR, specifically with 16 C.F.R. § 310.4(b). In 2003 (and currently), the TSR required a written agreement for calls made to lines registered with the DNC registry (in § 310.4 (b)(iii)(B)(1)), and in 2008 the TSR was amended to require a written agreement for prerecorded telemarketing calls (in 16 C.F.R. § 310.4(b)(1)(v)).

The FCC *was required to* issue its 2012 Order and subsequent regulation requiring prior express written consent for prerecorded message calls to cellular telephones, and this Court should enforce the FCC's written consent for prerecorded telemarketing to cellular telephones because the FCC stayed within its congressionally-delegated authority and did its required due diligence to make sure it was adhering to that which Congress mandated in the DNCIA.

### D. DentalPlans' Motion is Based on Stale Law.

DentalPlans does not do – or even mention – the above analysis required by *Loper*. Indeed, it does not spill a single word concerning congressional delegation or authority to issue regulations. Simply put, DentalPlans' motion is simply wrong in nearly every material legal respect with regard to application of Loper – the supposed justification for its motion. Instead of analyzing and applying the *Loper* test, DentalPlans rests its entire argument on the Eleventh Circuit's decision in *Insurance Marketing Coalition v. FCC*, 127 F.4th 303 (11th Cir. 2025).

*Insurance Marketing Coalition* – which was decided after *Loper* and *Cross Crossings* but before *McLaughlin* – illustrates the danger *McLaughlin* warned

against: treating agency rules as either categorically valid or categorically invalid without first asking whether Congress delegated authority in the particular domain. *IMC* invalidated the FCC regulations by appealing to "ordinary consent principles," but never examined whether Congress had, in fact, delegated the FCC power to issue regulations interpreting consent, never considered whether the FCC overstepped its authority in issuing such regulations and never considered the bases for FCC's regulation, such as experience, research, public outreach or other factors. Under *Loper / McLaughlin*, those threshold inquiries are mandatory. Because IMC did not perform this compulsory analysis, it has been abrogated and is no longer good law.

There are other substantial infirmities in DentalPlans' motion. It repeatedly makes declarations about how it should prevail,without analysis or explanation, and sometimes with misleading citations:

- "**The best (and the only) reading of the TCPA is that a writing is not required to give "prior express consent**." Br., Dkt. 166-1 at 11.

    o No explanation, analysis or reasoning.

- "**The FCC's interpretation of "prior express consent" contradicts every rule of statutory interpretation."** Br., Dkt. 166-1 at 12.

    o It is hard to imagine a regulation that breaks *every rule* of statutory construction. DentalPlans does not substantiate.

- "**The FCC did not base [its written consent] decision on principles of statutory interpretation. To the contrary, the FCC relied exclusively on bare policy rationale**." Br, Dkt. 166-1 at 12.

    o This statement is false. The FCC based its written consent for robocall to cell phone regulations on, "substantial record support, the volume of consumer complaints we continue to receive concerning unwanted, telemarketing robocalls, and the statutory goal of harmonizing our rules with those of the FTC." *In re TCPA 2012*, 27 FCC Rcd. 1830, ¶20 (2012)

21

Plaintiff objects to DentalPlans' filing a brief that purports to be based upon recent outcome-determinative Supreme Court jurisprudence, but that ignores the standards and test that those cases – and in particular *Loper* – requires. DentalPlans' motion is not supported by applicable law, and does not purport to constitute a good faith argument for the law's extension. This motion is a vexatious waste of time both because it omits reference to *Loper's* rule that analysis of a regulation necessitates review of congressional delegation, fails to do any analysis of whether the FCC's "written consent" requirement falls within its statutory authority and outright misrepresents the basis and reasoning behind the FCC's "written consent" regulations.[5]

No doubt DentalPlans intends to submit a reply brief that addresses the *Loper* test, but it has already multiplied these proceedings by requiring Plaintiff to file a motion for leave to file a surreply and draft a surreply in response to arguments that should have been – indeed were *required* by the Federal Rules to have been – addressed in DentalPlans' opening brief, making more work for Plaintiff and the Court.[6]

---

[5]     The undersigned sent an email to defense counsel Derin Dickerson on October 22, 2025, identifying DentalPlans' failure to analyze pursuant to the *Loper* test, asking that DentalPlans withdraw its motion and offering to agree to more time for DentalPlans to consider the request. Mr. Dickerson did not respond.

[6]     This is not the first time DentalPlans has failed to include important arguments in an opening brief. See SJ Order, Dkt. 138 at 11 n.6 (sorting out the myriad briefs submitted on summary judgment).

**E. Written Consent is Consistent with "Prior Express Consent."**

DentalPlans' entire motion is premised on the notion that requiring a signed written agreement between the consumer and the seller authorizing the seller to robocall the consumer's specific cell phone number is antithetical to "express consent." Nonsense.

"Express written consent" is a *subcategory* of "express consent," not a new category of consent altogether. And while it is true that Congress did not use the words "written consent" in 47 U.S.C. § 227(b)(1)(A)(iii), Congress did not use the words "oral consent," or suggest that oral consent could satisfy its "express consent" standard, either. The parties agree that "express" means "clearly and unmistakably stated." Black's Law Dictionary (12th ed. 2024). Requiring a writing is wholly consistent with "clearly and unmistakably stated." A signed writing promotes the notion that consent be "clear," because the terms of the agreement will be in "ink," and subject to review and substantial consideration by the consumer (and the telemarketer) both before and after signing. Similarly, a written consent requirement is perhaps the *only* way to ensure that consent is "unmistakable" and was entered into *by choice*[7] with full comprehension and agreement.

---

[7] Plaintiff submits that no rational consumer would knowingly choose to receive prerecorded telemarketing calls from *anyone*, much less a from company with which they recently terminated their relationship. Requiring a writing is the only meaningful way to achieve Congress' purpose of "protect[ing] residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object," 47 U.S.C. § 227(c)(1), while also ensuring that the consumer's consent is "clearly and unmistakably stated." H.R.Rep 102-317-1991, § 2 ¶¶ 5-9. See Section IV, *supra* for further discussion of this concept in the context of "regular" express consent.

Moreover, the written consent regulation's requirement that the agreement spell out that the consumer is consenting to "artificial or prerecorded voice" telemarketing calls also promotes clear and unmistakable consent. A primary purpose of the TCPA – and not coincidentally the purpose of Congress' mandate to the FCC – is to ensure that consumers have a choice as to which prerecorded telemarketing calls they receive. 47 U.S.C. § 227(c)(2) (directing the FCC to establish regulations designed to "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object"); DNCIA ¶3. The regulation's requirement the consent writing spell out that the consumer has agreed to receive prerecorded telemarketing calls, specifically, stands to buttress the notion that written consent is consistent with "express consent," because written consent unequivocally places the consumer on notice that they have a choice as to whether they wish to receive perhaps the most annoying of all telemarketing calls: prerecorded robocalls.

Caselaw bears out that "express consent" to receive prerecorded telemarketing calls means something more than merely giving one's telephone number to another. *Leckler v. CashCall, Inc.*, 554 F. Supp. 2d 1025, 1031 (N.D. Cal. 2008) ("*Leckler I*"), vacated, No. C 07-04002 SI, 2008 WL 5000528 (N.D. Cal. Nov. 21, 2008) ("*Leckler II*") is instructive. *Leckler I* considered a TCPA defendant's argument that the Plaintiff's provision of the subject cellular telephone number as part of a loan application constituted "express consent" within the context of 47 U.S.C. § 227(b)(1)(A)(iii). The defendant argued that the court should follow FCC's decision in *In re TCPA 2008*, 23

F.C.C. Rcd. 559, 560 (2008), and find that, the "provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." *Id.* at ¶9.

The Court performed a *Chevron* analysis of the FCC's 2008 order and found that its construction of "prior express consent" was manifestly contrary to the letter of the TCPA, and was unreasonable, because it "impermissibly amends the TCPA to provide an exception for "prior express or implied consent" and flies in the face of Congress' intent." *Leckler I*, 554 F. Supp. 2d at 1029-30. In doing so, *Leckler* relied upon Black's Law Dictionary's definition of the terms "express consent," "express" and "implied consent," and determined that pursuant to these definitions, providing one's cell phone number on a credit application constituted implied consent, not "express consent." *Id.* at 1031.

In its discussion of what "express consent" means, *Leckler I* used the district court's decision in *Satterfield v. Simon & Schuster*, 2007 WL 1839807 (N.D.Cal. June 26, 2007), as a foil. *Leckler* agreed with *Satterfield's* determination that Plaintiff Satterfield expressly consented to receive telemarketing text messages from the defendants by "filling out an online application for a free ringtone, … checked a box stating "[y]es! I would like to receive promotions from Nextones affiliates and brands," and clicked on an online "submit" button that was tied to the website's terms and conditions, which stated that the defendant was allowed to send texts to the Plaintiff's

phone number "in connection with any text message offering or other campaign." *Id.* at 1032. [8]

However, the Ninth Circuit reversed the *Satterfield* district court's determination that the ringtone application and terms and conditions were sufficient to confer "express consent," because those documents did not include Simon & Schuster as an entity that might send the subject text messages. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009). The Ninth Circuit's *Satterfield* decision demonstrates the precision "express consent" demands. Citing to Black's Law Dictionary, the Court found that express consent is "[c]onsent that is clearly and unmistakably stated," *Id.* at 955. The Court determined that providing Simon & Schuster's marketing partner Nextones with express consent was insufficient to confer express consent for the defendant. *Id.*

DentalPlans does not explain why it believes a requirement that consent be commemorated in a writing is inconsistent with "express consent." Indeed, instead of explaining its position, DentalPlans simply employs a string cite of caselaw that followed the FCC's 2008 ruling pursuant to the Hobbs Act, to find oral consent sufficient for "express consent." Def.Br. Dkt. 166-1 at 11. None of those cases is persuasive.

---

[8]     The *Leckler* Court vacated 554 F.Suppl 3d 1025 upon reconsideration, finding that the Hobbs Act prohibited it from invalidating the FCC's 2008 ruling. *Leckler v. Cashcall, Inc.*, No. C 07-04002 SI, 2008 WL 5000528, at *1 (N.D. Cal. Nov. 21, 2008). Today, *McLaughlin* would prohibit the Court from accepting *In re TCPA 2008*, as "Gospel;" a *Loper* analysis would be necessary.

26

*Gutierrez v. Barclays Grp.*, 2011 WL 579238, at \*4, 2011 U.S. Dist. LEXIS 12546, at \*11 (S.D. Cal. Feb.9, 2011) held that a husband's submission of wife's cell phone number in a written application for credit constituted "express consent." Gutierrez did <u>not</u> hold, as DentalPlans argues, that "prior express consent need not be in writing." The quotation DentalPlans cites arises from the Court's reference to what In re TCPA 1992 said, and was not the holding of the case. Instead, that Court held that "prior express consent *may be revoked orally* and need not be in writing." *Id*. at \*4 (emphasis added). *Gutierrez* is simply inapplicable here.

*Adamcik v. Credit Control Servs.*, 832 F. Supp. 2d 744, 748 (W.D. Tex. 2011) supports Plaintiff Bradley's position. *Adamicik* came to bar after a jury verdict for Plaintiff had been rendered. The defendant's post-trial motion argued that the jury's judgment for Plaintiff should be overturned, because revocation of consent needed to be in writing. *Adamcik* explicitly agreed with *Leckler I* that *In re TCPA 2008*'s "prior express consent" ruling "does clear violence to the clear language of [the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), because it authorized *implied* consent where the statute required *express* consent. *Id*. at n. 13. *Adamick* honored its now-defunct Hobbs Act duty to adhere to the FCC's ruling even though the Court found the standard articulated in the FCC's 2008 Order to be incorrect. Adamcik's statement that *In re TCPA 2008* did "clear violence" to the statutory phrase "express consent," and its repeated reference to the FCC's standard as "implied consent" mean that Adamcik supports Plaintiff's position that "express consent" requires more than merely giving one's number out.

*Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-cv-2902-CLS, 2012 WL 5511039, at * 3-4, 2012 U.S. Dist. LEXIS 160938, at *11 (N.D. Ala. Nov. 9, 2012) followed *In re TCPA 2008* pursuant to the Hobbs Act, to find that providing a cellular telephone number at the point of sale in connection with a simple filling of a prescription. A Wal-Mart employee explained to Plaintiff that this high-pressure sales tactic was only to contact the patient "in case there were any questions that came up." *Id.* at *2. *Pinkard* might be DentalPlans' best case, but it's not *that* good. *Pinkard* did no statutory construction analysis of the meaning of "express consent" whatsoever. Instead – without citation – the Court reasoned that the "overwhelming weight of social practice: that is, distributing one's telephone number is an invitation to be called, especially when the number is given at another's request," *Id.* at *5, even in a face-to-face situation where the consumer has no idea Wal-Mart planned to use the number for telemarketing purposes. The error in the Pinkard's reasoning is black-and-white in that quoted sentence: the Court found – pursuant to "social practice" – that providing one's telephone number was "clearly and unmistakably" an "invitation to be called." Pinkard's bald adherence to *In re TCPA 2008* undermines its validity post-*McLaughlin*. What is more, *Pinkard*'s *ipse dixit* holding that "the overwhelming weight of social practice" means that providing one's phone number to another automatically constitutes "express consent" to receive automated text messages is simply untethered to meaningful legal analysis. The Court should not follow *Pinkard*.

*Livingston v. U.S. Bank, N.A.*, 58 P.3d 1088, 1091 (Colo. App. 2002) is similarly unpersuasive. Livingston was a TCPA junk fax case that affirmed the trial court's

28

denial of class certification on the ground that individualized issues of consent predominate over common issues, requiring individualized inquiries. *Id*. The decision does not identify or explain how the defendant obtained the phone numbers it faxed. Instead, it merely states that – under the junk fax regulations – the spectre that some putative class might have provided oral "prior express invitation or permission" was sufficient to justify denial of class certification.

### IV. The Court should not Disturb its Prior Summary Judgment and Class Certification Rulings.

The change in analysis of regulations post-*Loper* and *McLaughlin* is the only reason DentalPlans provides for reconsideration. A correctly-reasoned *Loper* analysis confirms the validity and enforceability of the FCC's written consent requirement for robocalls to cell phones and its motion should be denied.

DentalPlans' script flunks the test even if "prior express consent" were the proper standard, because it does not ask the consumer whether they agree to receive prerecorded *telemarketing* calls. To the contrary: DentalPlans' script asked for the consumer's phone number "in case we get disconnected." Script, Dkt. 108-4 at DP000013-14. Congress and the FCC have made clear that telemarketing calls are more intrusive than informational calls, which suggests that in order for consent to receive them be "clearly and unmistakably stated," the consumer must knowingly authorize the telemarketing aspect of such calls. *In re TCPA 2012*, 27 FCC Rcd. 1830, 1839-40, ¶ 20-29 (2012) (explaining how intrusive telemarketing calls are); c.f. *Leckler I*, 554 F. Supp. 2d at 1030 (for "express consent" to exist "the called party must expressly consent not only to receiving telephone calls, but to receiving calls

made by a caller using an autodialer or prerecorded message."). Thus, even if the Court were to find that the FCC exceeded its authority in establishing its written consent regulations, it should still deny this motion.

## CONCLUSION

Respectfully submitted,

/s/_____

Alexander H. Burke (*pro hac vice*)
**BURKE LAW OFFICES, LLC**
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com


William (Billy) Peerce Howard (*pro hac vice)*
THE CONSUMER PROTECTION FIRM
401 E. Jackson Street, Suite 2340
Tampa, FL. 33602
Telephone: 813-500-1500
Billy@theconsumerprotectionfirm.com

*/s/ Peter A. Holland*
Peter A. Holland (Fed. Bar No. 10866)
THE HOLLAND LAW FIRM, P.C.
914 Bay Ridge Rd., Ste. 230
Annapolis, MD 21401
Telephone: (410) 280-6133
peter@hollandlawfirm.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on October 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

_/s/_

Appendix A – Comparison of TSR and TCPA Written Consent for Robocall Regulations

## Robocall Written Consent Regulation - Telemarketing Sales Rule, 16 C.F.R. § 310.4(b)(1)(v)

**(b)** *Pattern of calls.* (1) It is an abusive telemarketing act or practice and a violation of this part for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in, the following conduct:

**** **(v)** Initiating any outbound telephone call that delivers a prerecorded message … unless:

> **(A)** In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing, that:

>> **(i)** The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

>> **(ii)** The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

>> **(iii)** Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

>> **(iv)** Includes such person's telephone number and signature….

## Robocall Written Consent Regulation - Telephone Consumer Protection Act, 47 C.F.R. §§ 64.1200(a)(2) & (f)(9)

No Person or entity may: (2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, … other than a call made with the prior express written consent of the called party ****

> (f)(9) The term prior express written consent means an agreement, in writing, that bears the signature of the person called or texted that clearly and conspicuously authorizes … the person called or texted advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice. ***

> (i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

>> (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls or texts using an automatic telephone dialing system or an artificial or prerecorded voice; and

>> (B) The person is not required to sign the agreement (directly or indirectly) or agree to enter into such an agreement as a condition of purchasing any property, goods, or services. The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable Federal law or State contract law.